**WILLOW RIDGE LIMITED PARTNERSHIP, Plaintiff,**

v.

**STEWART TITLE GUARANTY COMPANY, Defendant.**

**Civ. A. No. E86–0132(L).**

United States District Court, S.D. Mississippi, E.D.

April 20, 1988.

William C. Walker, Jr., University, Miss., for plaintiff.

David W. Dogan, III, Daniel, Coker, Horton & Bell, Jackson, Miss., for defendant.

## MEMORANDUM OPINION AND ORDER

TOM S. LEE, District Judge.

This action was brought by Willow Ridge Limited Partnership (Willow Ridge), the insured under a policy of title insurance, against Stewart Title Guaranty Company (Stewart Title), the insurer, alleging breach of the policy and seeking actual and punitive damages. The case was tried by the court sitting without a jury. Upon the evidence presented at trial, the court finds as follows.

Plaintiff Willow Ridge purchased an apartment complex within the City of Meridian, Mississippi on April 23, 1985. At the time of its purchase, the apartments were still under construction by Bubber Wallace d/b/a Wallace Builders and Developers. The project was financed by a bond issue of Lauderdale County, Mississippi, which was secured by a first deed of trust in favor of First Alabama Bank and backed by a letter of credit issued in favor of First Alabama Bank by First Guaranty Savings Bank in Hattiesburg, Mississippi. First Guaranty also held a deed of trust on the property. The project, known as Hanover Square, was developed by Bubber Wallace and owned by Hanover Square, Limited, a Wallace entity.

In his efforts to sell the property, Wallace enlisted the aid of Louis Vance, an attorney/businessman, who put him in contact with John Gorecki, the individual in charge of acquisitions for Quadel Corporation, a privately held corporation. Quadel determined to acquire the project and formed a limited partnership, Willow Ridge, for purposes of the acquisition. Financing was arranged through the Bank of Meridian for the downpayment of $600,000, together with an assumption by Willow Ridge of the debt under the bonds and the letter of credit. The loan was to be secured by a third deed of trust on the property, and the Willow Ridge principals, Norman Watson and Thomas Webb, executed personal guarantees for the debt.

Ed Tonore, an attorney and an agent for Stewart Title, was retained to perform a title examination and provide a policy of title insurance on the property. Tonore's examination of title to the property revealed the Bank of Alabama and First Guaranty deeds of trust. Tonore found no liens for laborers or materialmen, but because the project was still under construction, he secured an owners and contractors affidavit from the owner, Bubber Wallace, that there were no unrecorded liens. Tonore issued a commitment to insure the property on April 23, 1985; under instruction from Willow Ridge representatives and with the authority of Stewart Title, Tonore deleted an exception which would otherwise have excluded from coverage liens for

material or labor.[1] Consequently, there was coverage for unrecorded materialmen's liens. On May 2, the closing date,[2] Willow Ridge took the property by warranty deed, which was recorded on that date, and an owner's policy was issued in favor of Willow Ridge by Tonore, which, like the commitment, did not include the standard exception for unrecorded materialmen's liens.

After Willow Ridge purchased the property, materialmen, on July 27, 1985, began filing liens, and from that time until August 14, 1985, approximately $900,000 in alleged materialmen's and laborors' liens were filed of record in Lauderdale County against the insured property. On August 14, Willow Ridge informed Stewart Title that liens were being filed against the insured property,[3] following which Stewart Title on September 17 retained Ronnie Walton of the law firm of Williams, Glover, Walton and MacAlilly to represent the interests of Willow Ridge.[4] However, Walton learned that on September 13 the Bank of Meridian had instituted foreclosure proceedings against the insured property and scheduled the foreclosure sale for October 7. After ruling out other alternatives for remedying the lien problem, Willow Ridge sought to enjoin the foreclosure. At the hearing on October 7, Willow Ridge and the Bank of Meridian entered into an agreement under the terms of which Willow Ridge agreed to dismiss its suit to enjoin in exchange for the Bank of Meridian's granting Willow Ridge the right of first refusal to buy the property back from the bank upon completion of construction[5] and additionally releasing Willow Ridge principals Webb and Watson from their personal guarantees and the $100,000 letter of credit. The foreclosure sale proceeded and the Bank of Meridian bought the subject property for $100,000.

A clear understanding of the parties' activities preceding the foreclosure is essential to a resolution of this case. According to Walton, when Dogan originally retained him to represent Willow Ridge, Dogan indicated that he was to file suit against Bubber Wallace[6] and to represent the interests of Willow Ridge and Quadel in defense of any suits brought by any materialmen. On September 23, Walton learned of the Bank of Meridian's pending foreclosure. Faced with the time constraints imposed by virtue of the scheduled foreclosure, Walton began considering alternative ways in which to prevent or at least postpone the foreclosure in an effort to buy time so that an arrangement could be worked out with the subcontractors on their lien claims. His main concern, he testified, was to stop the foreclosure. To that end, Walton had numerous discussions with David Dogan, the subcontractors and the Bank of Meridian.

In his discussions with the Bank of Meridian, the Bank indicated a willingness to discontinue the foreclosure proceeding if Webb and Watson, the principals of Willow Ridge, would furnish additional personal guarantees. However, Walton and Willow

---

1. In section 2 of Schedule B of the commitment and the policy, subparagraph (d), which provided that the title policy issued would contain an exception for "any lien, or right to a lien, for services, labor or material hereto or hereafter furnished, imposed by law and not shown by the public records," was lined through and initialed by Tonore. This court has previously determined that Tonore was authorized to make the deletion.

2. The closing was originally scheduled for April 22 but was delayed because all of the documentation was not complete.

3. By letter, Willow Ridge advised Stewart Title of the liens, stating "if these liens, claims and stop notices are not cleared up in prompt fashion, then the undersigned will suffer substantial losses...."

4. When David Dogan, counsel for Stewart Title, first contacted Walton in mid-September, he requested that Walton check the status of the land records relative to the Hanover Square project to determine what liens had been filed. After Walton reported his findings, Stewart Title requested that he represent Willow Ridge and retained him for that purpose.

5. This was to insure that the Bank of Meridian did not sell at a distress sale and pursue Willow Ridge for a large deficiency.

6. The basis for a suit against Wallace was his alleged fraud in connection with his furnishing to Tonore of the affidavit that there were no liens against the property.

Ridge, not wanting to increase the personal exposure of Webb and Watson, concluded that acceptance of the Bank's proposal was not a "practical" method for stopping the foreclosure. Walton additionally tried to persuade the subcontractors, to no avail, that it was in their best interest to take some action to stop the foreclosure.

Another option available to Willow Ridge and the one which Stewart Title believed was the most logical,[7] was to file suit to remove the liens as a cloud on Willow Ridge's title. Stewart Title thought such a suit would be successful based on its opinion that the liens, which were filed after the date of Willow Ridge's purchase of the property, were invalid as to Willow Ridge since it was a bona fide purchaser for value without notice. Stewart Title thus requested or instructed that Walton file whatever lawsuits were necessary to remove the liens as clouds. Willow Ridge however, while concurring in the opinion that the liens were invalid, concluded that immediately suing the subcontractors or Bubber Wallace was not an option or at least not a practical one; as a matter of economics, the subcontractors were needed to complete the work on the project. In response to these concerns, Dogan "rescinded" the instructions he had given Walton to file suit to remove cloud and instead informed Walton that Stewart Title would honor the terms and obligations of the policy in defending and prosecuting claims and that Walton should do what he thought was in the best interest of Willow Ridge. That is, neither he nor Stewart Title would instruct Walton as to how to proceed.[8] Dogan at trial explained that he still wanted Walton to file suit against the lien claimants but

did not want Walton to perceive him as dictating the course of action.

After ruling out a number of alternatives, including that suggested by Stewart Title, Walton concluded there were four options available to Willow Ridge:

(1) Willow Ridge could put additional money in to complete the project;

(2) It could allow the foreclosure to proceed and walk away—to keep from throwing "good money after bad"—to minimize losses;

(3) It could file suit to enjoin the foreclosure to "buy time" to determine if something could be worked out to allow completion of the project; and a final alternative was

(4) Willow Ridge's filing for bankruptcy protection.

Weighing these options, Willow Ridge and Walton decided that a suit to enjoin the foreclosure was its best option.[9] However, the foreclosure sale did ultimately proceed as described hereinabove. The Bank of Meridian filed suit against the lien claimants to clear title immediately after taking the property at foreclosure. The lienors reacted by filing an involuntary petition to place Willow Ridge, Bubber Wallace and Hanover Square in bankruptcy; included in the petition was a claim against the Bank of Meridian. Willow Ridge ultimately secured its dismissal from the bankruptcy action, since it no longer owned the property, following which Willow Ridge brought this action for recovery under the policy issued by Stewart Title.[10]

■ A policy of title insurance, like any other contract of insurance, is an agreement to indemnify in the event of a loss

---

7. Dogan acknowledged that a resolution of such a lawsuit could not be had before the date scheduled for the foreclosure, but said he thought that if such a suit were filed, the Bank of Meridian "might not go through" with the foreclosure, *i.e.*, would postpone until it determined whether the liens were valid.

8. Dogan explained at trial that he did this because Walton had expressed concern over being required to file a suit to remove cloud and described some hesitation about doing that.

9. Walton felt there was a good argument to be made that an injunction should issue since the Bank of Meridian was attempting to foreclose prematurely; the foreclosure was scheduled for October 7 whereas the due date on the deed of trust was not until October 21.

10. Willow Ridge had initially planned to file suit against Stewart Title immediately after foreclosure but delayed in doing so because of a provision in the policy that no suit could be filed for a period of sixty days following notice of loss.

occasioned by a risk insured against under the terms of the policy. 9 J. Appleman, *Insurance Law and Practice* § 5201 (1981). Under the policy at issue in the case at bar, Stewart Title insured as of May 2, 1985 (the date of the policy) against

> loss or damage ... and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by reason of:
>
> (2) any defect in or lien or encumbrance on such title;
>
> *   *   *   *   *   *
>
> (4) unmarketability of such title.

The policy also imposed on Stewart Title certain defense obligations:

> [The] Company at its own cost and without undue delay, shall provide for the defense of an insured in all litigation consisting of actions or proceedings commenced against such insured, or a defense interposed against an insured in an action to enforce a contract for the sale of its estate or interest in said land, to the extent that such litigation is founded upon an alleged defect, lien, encumbrance, or other matter insured against by this policy.

In this lawsuit, Willow Ridge alleges that title was defective and unmarketable when Stewart Title issued the policy on May 2, 1985 because of the unrecorded materialmen's liens; that Stewart Title, after being timely notified of the liens, failed and refused to clear the title of the defect caused by the liens; that the defect in the title contributed to the foreclosure of the property by the Bank of Meridian; and that because of Stewart Title's refusal to clear the title and later to defend against the foreclosure, Willow Ridge suffered loss and damage. Reduced to its essentials, Willow Ridge's position is that as a result of the liens, coupled with complete inaction on the part of Stewart Title, it lost the insured property through the foreclosure sale and is entitled under the policy to all loss occasioned by its having lost the property. Stewart Title takes the position that it has never denied coverage to Willow

Ridge for any loss it suffered by reason of the liens on the property, that its duty to pay never arose, that the foreclosure by the Bank of Meridian was not because of any defect in title, and that because Willow Ridge lost title to the property as a result of the foreclosure, Willow Ridge's loss is not covered by the title policy.

■ The question for consideration by the court is whether, under the facts presented, Stewart Title is obligated by the terms of the policy to pay for alleged losses by Willow Ridge based on an alleged defect in or lien or encumbrance on Willow Ridge's title. A further issue is whether Stewart Title breached its duty to defend Willow Ridge. Willow Ridge proposes a number of courses which it claims Stewart Title should have taken to prevent the foreclosure and Willow Ridge's consequent loss, including paying the lien claimants to discharge the liens, filing a suit to remove cloud and defending Willow Ridge against the foreclosure.

Dogan stated at trial that payment of the lien claimants was an option for Stewart Title; however, it declined to do so since it believed the liens were invalid. Stewart Title claims that its refusal to pay the claims which were the subject of the liens asserted against the property was not a breach of its policy duties. Specifically, Stewart Title urges that it was not required to pay since the liens were, in the opinion of both Stewart Title and Willow Ridge, not valid against the property for the reason that Willow Ridge took the property as a bona fide purchaser for value without notice of the liens. Walton acknowledged that Willow Ridge and Stewart Title had always taken the position that Willow Ridge was a bona fide purchaser without notice such that the liens which were filed after it acquired title did not attach and were not valid as to Willow Ridge.

It is not for this court to determine the validity *vel non* of the liens; the lienors would be necessary and indispensable parties to any action in which that decision

were undertaken to be made.[11] However, the court is of the opinion that under these circumstances, where not only the insurer but also the insured denied the validity of the liens, it was not incumbent upon Stewart Title to pay the amounts claimed by the lienors without a determination of the liens' validity.[12] In fact, under the clear terms of the policy, a claim did not arise and was not maintainable and hence Stewart Title's obligation to pay did not arise "until there has been a final determination by a court of competent jurisdiction ... adverse to the title, as insured." In the case at bar, the foreclosure and transfer of title to the Bank of Meridian occurred before there was any determination as to the validity of the liens. In fact, to date there has been no such determination.[13] Hence, it would seem that Stewart Title's duty to pay never arose. *See Bronen v. New York Abstract Co.,* 19 A.D.2d 821, 243 N.Y.S.2d 664 (1963) (under identical language, held condition precedent to policy was final determination adverse to title insured); *American Legion Ed Brauner Post No. 307, Inc. v. Southwest Title and Ins. Co.,* 253 La. 608, 218 So.2d 612 (1969) (under similar provision, holding that insurer must respond in loss suffered by insured only after its liability had been definitely fixed). Consequently, Stewart Title did not breach its obligations under the policy by failing to obtain discharge of the liens.

With reference to what Willow Ridge characterizes as Stewart Title's "duty" to file suit to remove the liens as clouds, the policy grants the company

> *the right* at its own cost *to institute and without undue delay prosecute any actions or proceeding* or to do any other act *which in its opinion may be necessary or desirable to establish the title to the estate or interest as insured,* and the Company may take any appropriate action under the terms of this policy, whether or not it shall be liable thereunder, and shall not thereby concede liability or waive any provision of this policy. (emphasis added).

Willow Ridge reasons that

> [t]he policy requires that ... any attempt to clear title be commenced without undue delay.... Thus, Defendant had a duty to attempt to clear the title by removing the liens prior to the foreclosure sale.

*Plaintiff's Proposed Findings of Fact and Conclusions of Law,* at pp. 7–8.

Where the language of a policy of insurance, including title insurance, is ambiguous, "a reasonable construction in favor of the insured is indicated." *Great American Ins. Co. v. Bass,* 208 Miss. 436, 439, 44

---

**11.** Based on the facts presented by Willow Ridge and Stewart Title, it would appear that the liens were not valid. *See Southern Life Ins. Co. v. Pollard Appliance Co.,* 247 Miss. 211, 150 So.2d 416, 421 (1963) (bona fide purchaser takes priority over claims of materialmen and laborers unless it has actual, constructive or inquiry notice of the liens); Miss.Code Ann. § 85–7–131 (Supp.1987) (laborers' lien takes effect as to purchasers for value without notice only from time of commencing suit to enforce lien or filing contract under which lien arose of record). However, there could be evidence which the lienors might present, if given the opportunity, which would defeat any claim that the liens were invalid. For example, a lienor might have information tending to show Willow Ridge had notice of the claims.

**12.** There was a great deal of confusion as to the amount claimed for liens for which Stewart Title had or could have had potential liability. Its policy specifically exempted from coverage liens attaching after May 2, the date of the policy, and the lienors did not begin filing their liens of record until July 27. Hence, there were obvious difficulties in separating and determining what amounts of the approximately $900,-000 assertion as liens were claimed to have been due for work performed and materials furnished prior to May 2.

Subsequent to the foreclosure, Tom Bordeaux, an attorney representing the Bank of Meridian, made an exhaustive compilation of information relative to the amounts claimed as liens on the project and concluded that the amount owed for work performed prior to May 2 was approximately $300,000. The remaining $600,000 represented work performed and materials furnished after May 2 and for projects other than the Hanover Square Project.

**13.** The validity of the liens as against the Bank of Meridian was raised in the bankruptcy proceedings and as yet, the issue has not been decided. Stewart Title, under the defense obligations of the mortgagee policy issued in favor of the Bank, has provided the Bank with representation in those proceedings.

So.2d 532, 533 (1950). Here, however, the language of the policy is clear and unambiguous. While a suit to clear title was an option available to Stewart Title, it was an option and nothing more than that. *See Childs v. Mississippi Valley Title Ins. Co.,* 359 So.2d 1146 (Ala.1978) (company owed no duty to take affirmative action to clear title); *Securities Service, Inc. v. Transamerica Title Ins. Co.,* 20 Wash.App. 664, 583 P.2d 1217 (1978) (no duty to clear title). *But see Summonte v. First American Title Ins. Co.,* 180 N.J.Super. 605, 436 A.2d 110 (1981) (company had obligation to remove judgment lien). Of course, had Stewart Title chosen to attempt to clear title, it would have been required to do so without undue delay. Thus, contrary to Willow Ridge's assertion, it was not a breach of the terms of the policy for Stewart Title not to file such a suit.

The court notes that the policy coverage was not illusory by virtue of the optional nature of this provision since the insured also had an option of filing suit to clear title at company expense.[14] In fact, Stewart Title did suggest to Willow Ridge, via Ronnie Walton, that it file a suit to clear title. Yet Willow Ridge chose not to take that route, despite Stewart Title's urging. It is curious that Willow Ridge would now complain of Stewart Title's failure to attempt to remove the liens as clouds when Stewart Title provided counsel for Willow Ridge and suggested to Willow Ridge that it file suit, yet Willow Ridge, well aware that such a suit was an available option, chose not to do so.

Willow Ridge claims that the defect in title, i.e., the liens, contributed to the foreclosure of the property by the Bank of Meridian and that because of Stewart Title's refusal to clear title and defend against the foreclosure, Willow Ridge suffered loss for which it is entitled to recover. Willow Ridge acknowledges that Stewart Title hired counsel, Walton, to represent Willow Ridge and characterizes that as a

"step in the right direction;" yet it argues that prior to the foreclosure, Stewart Title attempted to interfere with Walton's loyal representation of Willow Ridge and that ultimately, Stewart Title "cut [Walton] loose." Walton, at trial, explained that in the days immediately preceding the foreclosure, he perceived that the relationship between Stewart Title and Willow Ridge had become adversarial. Contributing to this perception was Stewart Title's withdrawal of its prior instruction to Walton that he file suit to clear title.[15] Additionally, Walton testified that on October 4 Willow Ridge communicated to Dogan a settlement figure of $1,464,075.31 which was rejected. There was also discussion concerning the possibility of Stewart Title's paying $600,000, representing the debt to the Bank of Meridian. Walton felt that the claim would be settled for that amount, but a settlement did not materialize. Instead, Dogan indicated that there would be no settlement. According to Walton, Stewart Title's position on October 4 was that its obligation was to defend and prosecute; it was not going to see that the Bank of Meridian debt was paid since the debt was, in its opinion, not its obligation under the policy. Further according to Walton, Stewart Title was taking the position that it was not obligated under the policy to assist in stopping the foreclosure and was therefore going to permit it to proceed and would simply fall back on the Bank of Meridian's mortgagee policy, which Stewart Title had also issued, when the bank took the property at foreclosure. At that point, Walton felt that the interests of Willow Ridge and Stewart Title had diverged into an adversarial relationship.

In his testimony, Dogan explained that Stewart Title had rescinded its previous instructions to Walton about clearing title, but claimed that this was done in order that Walton could control his representation of his client and use his own independent judgment in determining what course

---

**14.** Under the terms of the policy, the company agreed to pay "all costs, attorneys' fees and expenses of litigation carried on by such insured with the written authorization of the company...."

**15.** *See supra* note 8.

to take. And, although Stewart Title did withdraw its "instruction" that Walton sue to clear title, it did not withdraw authorization for such a suit. From Walton's testimony it is clear that he did not perceive that to be the case, as he stated that Dogan had "just rescinded the notion that he was instructing me" as to what to do. Dogan further explained that Stewart Title had rejected the settlement figure suggested by Willow Ridge ($1,464,075) because he and Stewart Title considered it too high, and Dogan agreed that Stewart Title had determined not to pay the note of the Bank because it was the title, not the debt, which was insured by the policy. Dogan denied, however, that Stewart Title told Walton that it intended to let the foreclosure proceed or that the company otherwise withdrew its support from Willow Ridge. The court credits his testimony and observes that while Walton may have perceived the relationship with Stewart Title to have become adversarial, that does not appear to have been the case in fact. Moreover, Walton acknowledged that he understood at all times his duty was to represent and act in the best interest of his client, Willow Ridge. And there has been no contention by Willow Ridge that it received anything less than complete and loyal assistance of counsel to protect its interest. In the court's opinion, Stewart Title discharged its duty to defend the foreclosure proceeding, if such a duty existed,[16] since Ronnie Walton was retained by the company for the purpose of protecting the interest of the insured.[17]

The owner's policy issued by Stewart Title covers losses incurred "by reason of" any lien on the title. Willow Ridge claims that the foreclosure was a proximate result of the liens, arguing that the project shut down because Wallace could not pay the materialmen who therefore filed notices of liens. Because the project then shut down, no further payments to the lenders were made and the Bank of Meridian sought to foreclose to secure its position. However, in the court's opinion, Willow Ridge failed to prove that the foreclosure was caused by the existence of the liens. Rather, it appears that the occurrence which was the primary precipitating cause was the failure of Willow Ridge to service the debts owed to First Guaranty and First Alabama Bank. The evidence showed that Willow Ridge, upon purchasing the property, assumed the obligations of the debts to First Guaranty and Alabama Bank, including the debt service obligations. In a separate contract with Bubber Wallace, Willow Ridge and Wallace agreed that Wallace would service the debts. Yet he failed to do so, thereby placing the debts in default. First Guaranty threatened to foreclose as a result of that failure of payment which, as far as First Guaranty was concerned, was a failure by Willow Ridge. The Bank of Meridian was notified that First Guaranty intend-

**16.** Stewart Title takes the position that it was not required to defend the foreclosure proceeding since the foreclosure was caused, not by the existence of the liens, but rather by a default in a debt obligation owed to the Bank of Meridian. Since that debt was specifically excluded from coverage by the title policy, the duty to defend did not extend to the foreclosure proceeding. This position appears to be meritorious, but inasmuch as Stewart Title did in fact provide a defense, it merits only mention.

**17.** At the time it retained Walton, Stewart Title believed that a conflict of interest might arise between it and Willow Ridge since Stewart Title had taken the position that Ed Tonore's deletion of standard exception (d) was unauthorized. For that reason, it opted to retain independent counsel for Willow Ridge. Because "[a]n attorney obviously should not attempt to represent a party when he is obligated to represent an adverse interest, and a conflict of interest appears[,]" *State Farm Mutual Automobile Ins. Co. v. Commercial Union Ins. Co.,* 394 So.2d 890, 894 (Miss.1981), it has been held that

> [p]rovision of independent counsel or reimbursement for the insured's choice of counsel and expenses ordinarily fulfills the duty to defend, and is particularly appropriate where ... there is a conflict of interest between the insurer and the insured.... Indeed, where there is a conflict of interest, ethical considerations may even require that the insurer provide counsel rather than participate in the defense.

*Cay Divers, Inc. v. Raven,* 812 F.2d 866, 870 n. 3 (3rd Cir.1987) (citations omitted). *See also Ezell v. Hayes Oilfield Constr. Co., Inc.,* 693 F.2d 489, 493 (5th Cir.1983) (duty to defend not breached where insurer because of conflict refuses to defend but provides counsel at its cost to insured).

ed to foreclose and, as a junior lienor, determined to institute foreclosure proceedings to avoid being cut off by a foreclosure by First Guaranty. That is, the Bank of Meridian was pressured by First Guaranty to foreclose since, if the Bank of Meridian did not, First Guaranty would. And, although the Bank of Meridian note was not yet due at the time of the foreclosure, a clause in its deed of trust allowed it to call the debt due if it in good faith deemed itself insecure and its prospects of payment impaired. Willow Ridge asserts that the basis for the Bank's deeming itself insecure was the existence of the liens. However, the reason for the foreclosure by the Bank of Meridian was to prevent losing its rights in the event of a foreclosure by First Guaranty; and there was no indication that First Guaranty would have declined to foreclose had the lien problem been cured because the First Guaranty debt would still have been in default.[18] The court is not persuaded from the evidence presented that the foreclosure and consequent loss to Willow Ridge was "by reason of" the materialmen's liens.[19]

Furthermore, even assuming the foreclosure was an end result of the lien problem, the evidence presented at trial revealed that Willow Ridge could have stopped the foreclosure, but ultimately made a conscious business decision not to do so. Walton testified that in the week preceding the scheduled foreclosure, his main concern and objective was to stop, or postpone, the foreclosure. To that end, he had numerous conversations with Dogan, the subcontractors and the Bank of Meridian. The Bank of Meridian indicated a willingness to discontinue the foreclosure if

Webb and Watson would give additional personal guarantees, but, because Willow Ridge did not want to subject them to greater exposure in the project, it concluded not to take that approach. Instead, Willow Ridge did file suit to enjoin the foreclosure as a way to "buy time," but at the last minute, worked out an arrangement with the Bank of Meridian to let the foreclosure proceed. Walton expressed that he had been concerned that if the judge did grant Willow Ridge's relief, i.e., enjoin the foreclosure, but required a large bond, the company might have difficulty in posting the bond. Willow Ridge now claims that it was forced to settle with the Bank of Meridian since Willow Ridge was not able to provide an injunction bond. However, Walton did not say Willow Ridge could not make a bond, and in fact conceded that it could have posted the bond. However, Willow Ridge did not think it was practical to do so. In sum Willow Ridge could have prevented the foreclosure, but chose not to.

■ Stewart Title claims that the foreclosure by which Willow Ridge lost title to the property terminated the policy. Willow Ridge, however, asserts that Stewart Title's failure following the foreclosure to discharge its obligations under the policy, both to defend and to pay, and its decision that it was not obligated to Willow Ridge for anything occurring after the foreclosure, were without authority in the policy. The policy specifically provided that

*the coverage of this policy shall continue in force as of Date of Policy in favor of an insured [1] so long as such insured retains an estate or interest in the land,* or [2] holds an indebtedness

---

**18.** Of course, both the lien situation and the fact of the default to First Guaranty had a common source—the failure of Bubber Wallace to perform his obligations. And in that sense, the two were related, but the obligations were separate and the failure to satisfy the obligations affected the project and the parties differently.

**19.** Prior to the foreclosure, both David Dogan and James Roush were under the impression that the foreclosure was due to the liens based on what they had been told by Willow Ridge representatives. Dogan said he thought it inconsistent for the Bank to deem itself insecure

based on the liens since the liens, if they were valid, were covered under the policy and the Bank was aware of the coverage. However, Dogan explained that on the morning of the hearing on Willow Ridge's motion to enjoin, Bill Hammack, counsel for the Bank of Meridian, upon inquiry from the court, explained that the foreclosure sale was a means of preventing its rights from being extinguished by a prior foreclosure by First Guaranty. Dogan expressed that he was surprised to learn the reason, since it had been his understanding that the liens precipitated the foreclosure.

secured by a purchase money mortgage given by a purchaser from such insured, or [3] so long as such insured shall have liability by reason of covenants of warranty made by such insured in any transfer or conveyance of such estate or interest; provided, however, this policy shall not continue in force in favor of any purchaser from such insured of either said estate or interest or the indebtedness secured by a purchase money mortgage given to such insured. (emphasis supplied).

The clear and unambiguous import of this passage is that once the insured's interest in the land ceases, the coverage under the policy terminates. Hence, once Willow Ridge lost title to the property through foreclosure, it no longer had any legal interest in the property and the policy was rendered ineffective.[20] And, since there was never a determination as to the validity of liens prior to the foreclosure, Stewart Title's duty to pay based on the alleged defect never arose.[21]

■ Willow Ridge also raises an issue in this lawsuit concerning whether title to the property was marketable at the time the policy was issued since the policy provides coverage for loss or damage sustained by reason of unmarketability of title. Willow Ridge alleges that its title was unmarketable because of the unrecorded laborors' and materialmen's liens and that it has therefore sustained a loss under its policy. Stewart Title, on the other hand, contends that title was marketable as of the date the policy was issued and consequently, the coverage obligation for unmarketability of title never became operative.[22]

Title is marketable if it is free from reasonable doubt and is a title which a reasonable, well informed buyer would be willing to accept. *See Jones v. Hickson,* 204 Miss. 373, 37 So.2d 625, 620 (1948). The question then is whether a buyer such as Willow Ridge, which was unaware of the existence of unrecorded liens, could be considered well informed. The parties agree that had the fact of the unrecorded liens been known at the time the policy was issued, title would have been unmarketable. Stewart Title nevertheless asserts that Willow Ridge was well informed, despite its lack of knowledge of the liens, since all the normal title examination procedures were followed and no liens were revealed. That is, it appears to take the position that absent negligence or some omission on its part in failing to discover defects in title, the buyer/insured must be considered well informed. In the court's

20. Willow Ridge appeared to take the position at trial that Stewart Title breached its duty to Willow Ridge by failing to specifically inform Willow Ridge that if it lost title through foreclosure, the coverage of the policy would cease. In the court's opinion, a sophisticated business enterprise such as Willow Ridge, represented by counsel, did not need to be told to read its policy. And had it read the policy, surely it should have realized the implications of the foreclosure as concerned coverage.

21. A different result would most likely obtain if the foreclosure had in fact been caused by a defect insured against. But here, the court is not persuaded that the liens caused the foreclosure. It is not the finding of this court that Willow Ridge voluntarily consented to the foreclosure, but it did, for valuable consideration, agree with the Bank of Meridian to dismiss its suit to enjoin foreclosure. Under the totality of the circumstances, the court is of the opinion that Willow Ridge cannot now claim that coverage under the policy continued past the date title was transferred to the Bank of Meridian.

22. Part of the rationale upon which Stewart Title bases its assertion that title was marketable on the date of issuance despite the unrecorded liens is quite remarkable. Stewart Title reasons that on May 2, when it insured title to the project, title was marketable because the property was sold to a sophisticated buyer, Willow Ridge, a sophisticated lender, the Bank of Meridian, took a mortgage on it for $600,000, and a reputable title insurance company, Stewart Title, was willing to insure the title under both an owner's and mortgagee policy. The court observes that the fact that a title insurance company, reputable or not, would agree to insure a title has little bearing on the marketability of that title. If this were a criterion for marketability, nothing would be gained by insuring against unmarketability since marketability would be determined by the mere issuance of the policy. The insured would need no protection against unmarketability and a provision purporting to cover unmarketability would be superfulous. *See Kipahulu Inv. Co. v. Seltzer Partnership,* 4 Haw.App. 625, 675 P.2d 778, 781 (1983) (existence of title insurance did not satisfy requirement of marketable title).

view, the term well informed would ordinarily presuppose knowledge by the buyer of matters that could subject the title in question to litigation. The unrecorded liens at issue in the case at bar clearly fall within this category. The correctness of defendants' assertion is not determinative[23] since even if title were unmarketable, Willow Ridge would not automatically be entitled to recover under the policy. The unmarketability must have caused a loss to the insured.

Here, the unmarketability, if any, was caused by the existence of liens, but as this court has previously held, there was no showing by Willow Ridge that the liens caused Willow Ridge's loss. That is, the analysis of Willow Ridge's unmarketability claim is similar to that for its claim of a lien defect. One notable difference, however, is that as to Willow Rige's claim that a lien defect caused its loss, an issue arises as to the validity of the liens and the policy requires a determination of validity before the duty to pay arises. With reference to unmarketability, the mere existence of the liens, whether valid or not, is sufficient to render title unmarketable. That does not, however, obviate the necessity of proof on the issue of causation—there must be a causal connection between the unmarketability and the loss sustained. The court finds that Willow Ridge has failed to demonstrate such a connection and consequently, Willow Ridge may not recover under the policy on its claim of unmarketability.

Because, in the court's opinion, plaintiff has failed to establish any breach by defendant of its obligations under the policy, it follows that plaintiff's claim for punitive damages for tortious breach of contract by defendant must fail.

Based on the foregoing, the court finds that plaintiff's complaint against the defendant should be dismissed with prejudice. A separate judgment shall be entered in accordance with Federal Rule of Civil Procedure 58.

---

**23.** Obviously, if the company, through its own negligence, had failed to discover the existence of the liens, it could not then claim title was marketable despite lack of knowledge of those liens. In the present case, however, the court finds that there was no negligence on the part of Stewart Title, or its agent Ed Tonore, in failing to learn of the liens.