CONCURRING: GARYE L. VÁSQUEZ, Presiding Judge, and MICHAEL MILLER, Judge.

310 P.3d 23

**CENTENNIAL DEVELOPMENT GROUP, LLC, an Arizona limited liability company, Plaintiff/Appellant,**

v.

**LAWYER'S TITLE INSURANCE CORPORATION, Defendant/Appellee.**

No. 1 CA–CV 12–0080.

Court of Appeals of Arizona, Division 1, Department A.

Sept. 19, 2013.

---

148

Holland Law Firm PLLC By Joseph E. Holland, Snowflake, Attorneys for Plaintiff/Appellant.

Fidelity National Law Group By Patrick J. Davis, David M. LaSpaluto, Phoenix, Attorneys for Defendant/Appellee.

## OPINION

JOHNSEN, Chief Judge.

¶1 Centennial Development Group, LLC sued Lawyer's Title Insurance Corporation after the latter's title commitment failed to

disclose an easement. We affirm the superior court's holding on summary judgment that Arizona Revised Statutes ("A.R.S.") section 20–1562 (West 2013) bars Centennial's claim for negligence.[1] We reverse the dismissal of Centennial's contract claim, however, because although the title policy that Lawyer's Title issued only covers damages sustained while the insured owns the affected property, the "continuation of insurance" provision of the policy does not bar a claim for such damages made after the property is sold.

## FACTS AND PROCEDURAL BACKGROUND

¶2 Centennial contracted to buy 75 acres in Snowflake. It made a down payment of $50,000 toward the purchase price of $1,500,000 and gave the seller two notes and deeds of trust to secure its obligation to pay the balance. In connection with its purchase, Centennial obtained a title commitment and a title insurance policy from Transnation Title Insurance Company, now Lawyer's Title. Roughly a year after closing, Centennial discovered a roadway and utility easement across its property that the commitment had not disclosed. Believing the easement substantially diminished the value of its property, Centennial unsuccessfully tried to sell the property, then defaulted on its carry-back loan from the seller. In lieu of foreclosure, Centennial reconveyed all but one acre to the prior owner through a warranty deed subject to all easements of record. The easement at issue does not burden the single acre Centennial retained.

¶3 Centennial sued Lawyer's Title, alleging negligence and breach of contract. The superior court granted summary judgment in favor of Lawyer's Title on both claims. We have jurisdiction of Centennial's timely appeal pursuant to Article 6, Section 9, of the Arizona Constitution, and A.R.S. §§ 12–120.21(A)(1) (West 2013) and –2101(A) (West 2013).

## DISCUSSION

### A. Standard of Review.

¶4 Arizona Rule of Civil Procedure 56(a) allows a court to enter summary judgment

---

1. Absent material revision after the relevant date, we cite a statute's current version.

when "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." We review a summary judgment *de novo*, viewing the facts and inferences drawn from those facts in the light most favorable to the party against which judgment was entered. *Brookover v. Roberts Enters., Inc.*, 215 Ariz. 52, 55, ¶ 8, 156 P.3d 1157, 1160 (App.2007). We will affirm if the summary judgment is correct for any reason. *City of Tempe v. Outdoor Sys., Inc.*, 201 Ariz. 106, 111, ¶ 14, 32 P.3d 31, 36 (App.2001). The interpretation of an insurance contract is a question of law we review *de novo*. *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397, ¶ 8, 187 P.3d 1107, 1110 (2008).

### B. The Negligence Claim.

■ ¶ 5 Centennial's negligence claim alleged Lawyer's Title misrepresented the condition of title by omitting the easement from the report of exceptions attached to the policy. Centennial alleged the omission of the easement constituted a negligent misrepresentation on which it reasonably relied in deciding to buy the property. The superior court granted summary judgment against Centennial based on A.R.S. § 20–1562, reasoning the statute bars an insured from relying on information contained in a report of exceptions attached to a title insurance policy. *See* A.R.S. § 20–1562(5).

■ ¶ 6 Before a title insurer issues a policy, it reviews public records for defects, then issues a title commitment that lists exceptions to coverage. *Action Acquisitions*, 218 Ariz. at 398, ¶ 11, 187 P.3d at 1111. The insurance policy to which the list of exceptions is attached is not a promise that no other exceptions or encumbrances exist. Rather, the policy is a contract under which the insurer agrees to indemnify the insured for losses caused by claims arising from encumbrances not identified in the insurer's commitment. *See Swanson v. Safeco Title Ins. Co.*, 186 Ariz. 637, 641, 925 P.2d 1354, 1358 (App.1995) ("Title insurance does not guarantee perfect title; instead, it pays damages, if any, caused by any defects to title that the title company should have discovered but did not."); *see also Action Acquisi-*

*tions*, 218 Ariz. at 398, ¶ 11, 187 P.3d at 1107; *Siegel v. Fidelity Nat'l Title Ins. Co.*, 46 Cal.App.4th 1181, 54 Cal.Rptr.2d 84, (App. 1996) ("[T]he function of title insurance is to protect against the possibility that liens and other items not found in the search or disclosed in the preliminary report exist.").

¶ 7 Before A.R.S. § 20–1562 was amended in 1992, an insurer could be liable in Arizona for issuing a title commitment that negligently failed to disclose an encumbrance of record. *See Moore v. Title Ins. Co. of Minn.*, 148 Ariz. 408, 412, 714 P.2d 1303, 1307 (App. 1985). Jurisdictions were divided on this issue, and Arizona was among several that equated a title insurer's duty with that owed by an abstractor, which may be liable for negligence if it fails to include liens of record in the abstract. *Id.* at 411, 714 P.2d at 1306; *see also U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 746–47 (Ind. 2010) (collecting cases).

¶ 8 But a 1992 amendment to A.R.S. § 20–1562 changed that rule by effectively barring a common-law claim against an insurer whose title commitment fails to identify a cloud on title. *See generally State v. Rios*, 225 Ariz. 292, 298, ¶ 21, 237 P.3d 1052, 1058 (App.2010) (when a statute conflicts with common law, the statute prevails). The amendment added definitions for three new terms, "Abstract of title," "Preliminary report" and "Title insurance policy." 1992 Ariz. Sess. Laws, ch. 203, § 8 (2d Reg.Sess.). As amended, the statute draws a clear distinction between an abstract and a title commitment:

1. "Abstract of title" means a written representation ... that is *intended to be relied on* by the person who has contracted for the receipt of the representation. The abstract of title shall include all recorded conveyances, instruments or documents that impart constructive notice with respect to the chain of title to the real property described in the abstract. An abstract of title is not a title insurance policy.

\* \* \*

5. "Preliminary report", "commitment" or "binder" means a report that is furnished in connection with an application for title insurance and that offers to issue a title

insurance policy subject to the stated exceptions set forth in the report.... *The reports are not abstracts of title and the rights, duties and responsibilities relating to the preparation and issuance of an abstract of title do not apply to the issuance of a report. The report is not a representation as to the condition of title to real property* but does constitute a statement of the terms and conditions on which the issuer is willing to issue its title insurance policy if the offer is accepted.

A.R.S. § 20–1562(1), (5) (emphasis added).

¶9 Under the plain language of the amended statute, the title commitment that Lawyer's Title issued in connection with its policy was not a representation of the condition of the title to the property. Nor did the insurer's issuance of the commitment subject it to "the rights, duties and responsibilities relating to the preparation and issuance of an abstract of title." A.R.S. § 20–1562(5). Because the commitment was "not a representation as to the condition of title" to the property, it cannot form the basis of a claim by Centennial for negligent misrepresentation.

¶10 Centennial argues § 20–1562 does not protect a title insurer from liability pursuant to Restatement (Second) of Torts § 552 (1977) for failing to exercise reasonable care in supplying information in the course of its business. But we do not follow the Restatement when it conflicts with an Arizona statute. *See Ocotillo W. Joint Venture v. Schwartz,* 173 Ariz. 486, 489, 844 P.2d 653, 656 (App.1992). Our statute controls here: As a matter of law, no rights, duties or responsibilities arose with Lawyer's Title's issuance of the commitment, and the commitment was not a "representation as to the condition of title" on which Centennial could rely. A.R.S. § 20–1562(5).[2] Thus, the superior court correctly entered summary judg-

ment for Lawyer's Title on Centennial's negligence claim.

### C. The Contract Claim.

■ ¶11 The policy insures Centennial "against loss or damage ... sustained or incurred ... by reason of ... [a]ny defect in or lien or encumbrance on the title." That grant of coverage, however, is subject to the following condition:

2. CONTINUATION OF INSURANCE AFTER CONVEYANCE OF TITLE.

The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land, ... or only so long as the insured shall have liability by reason of covenants of warranty made by the insured in any transfer or conveyance of the estate or interest.

In entering summary judgment against Centennial on its contract claim, the superior court concluded that under this provision, Lawyer's Title owed no obligation to Centennial with respect to the 74 acres Centennial had reconveyed to the prior owner. And because the single acre Centennial retained was not affected by the undisclosed easement, the court held Lawyer's Title owed no duty to cover the loss Centennial alleged it incurred when it discovered the easement.

¶12 The policy condition recited above plainly provides that coverage continues only so long as the insured owns the affected property. Put differently, once the insured's interest in the land terminates, coverage under the policy terminates as to that interest. *See Chicago Title Ins. Co. v. 100 Inv. Ltd. P'ship,* 355 F.3d 759, 763 (4th Cir.2004) (under quoted provision, policy is effective during "the period running from the effective date of the policy until the insured conveys away its interest in the land"). After Centennial conveyed 74 of the 75 acres back to the prior owner, the policy no longer "contin-

---

**2.** California courts similarly hold that the California legislature's enactment in 1981 of nearly identical provisions precludes a tort action against an insurer based on information in a title commitment. *See* Cal. Insurance Code §§ 12340.10, 12340.11 (West 2013); *Siegel v. Fidelity Nat'l Title Ins. Co.,* 46 Cal.App.4th 1181, 54 Cal.Rptr.2d 84, (App.1996); *Southland Title*

*Corp. v. Superior Court,* 231 Cal.App.3d 530, 282 Cal.Rptr. 425, 429–30 (1991). *See also Barstad v. Stewart Title Guar. Co., Inc.,* 145 Wash.2d 528, 39 P.3d 984, 991 (2002) ("majority of state courts in Ninth Circuit ... have held that title insurance companies have no general disclosure duty in preliminary commitments").

ue[d] in force" as to the 74 acres, given that the conveyance was made subject to all easements of record. *See Point of Rocks Ranch, L.L.C. v. Sun Valley Title Ins. Co.*, 143 Idaho 411, 146 P.3d 677, 679 (2006) ("Because the deed excluded easements from the covenants of warranty, the [insured] ... did not have any liability for the breach of such covenants due to the existence of the easement.").

¶ 13 Centennial's damage theory, however, is that it paid too much for the property because it was unaware of the easement, and ultimately had to give back the property because it is not worth the purchase price. Thus, Centennial alleges it incurred damages while it owned the property, within the "continuation of coverage" condition of the policy. *See Swanson*, 186 Ariz. at 641–42, 925 P.2d at 1358–59 (damages valued as of the date title defect is discovered).

¶ 14 We are not persuaded by Lawyer's Title's argument that, as a matter of law, Centennial's reconveyance of the affected property bars its claim for damages. Lawyer's Title cites no policy language that requires the insured own the affected property at the time it makes a claim. While the policy makes plain that *coverage* continues only so long as the insured owns the property, it contains no similar restriction on when an insured may file a claim. *See* Burke, *Law of Title Insurance* § 5.02 (3d. ed. Supp.2012) (a "post-coverage claim" may be made on a title insurance policy "so long as the damages were sustained during coverage.").

¶ 15 Each side argues *Chicago Title* resolves the issue in its favor. The insured in that case owned 300 acres, including a one-acre parcel called the Miller tract. *Chicago Title*, 355 F.3d at 761. After the insured sold the Miller tract by special warranty deed, it discovered a competing conveyance by which a third party claimed to have owned the tract. *Id.* at 761–62. Seeking to clear title for the benefit of the party to which it had sold the Miller tract, the insured bought back the tract from the other purported owner. The third-party owner then sued the insured, alleging trespass during the prior period the insured had purported to own the tract. *Id.* The insured made a claim on its title insurance policy, demanding the insurer both in-

demnify it for the cost of repurchasing the tract and defend it in the trespass litigation. *Id.*

¶ 16 Applying Maryland law, the Fourth Circuit Court of Appeals examined a "continuation of insurance" provision similar to the one at issue here. The court explained:

A natural reading of this policy language evinces the intent of the parties to limit the scope of title protection to the period running from the effective date of the policy until the insured conveys away its interest in the land, unless, in the conveyance, the insured gives warranties to the grantee. If the insured does give a warranty to the grantee, coverage extends to protect the insured's obligation under that warranty. But if it does not, then title insurance for that land ends, and any risk of loss for defective title becomes the problem of the new owner.

The allocation of risk by this agreement gives title insurance coverage to the insured during the period when the insured purportedly owns the property, when most of the adverse consequences due to a defective title would occur. If a preexisting defect in title were to remain after the insured conveyed the land, the risk inherent in that defect would pass to the purchaser and the insured would no longer have risk, nor coverage. Of course, if the insured were to warrant the property against title defects, then the insured would be retaining the risk of a defective title, and coverage would continue for that risk. Thus, if the conveyance were accomplished by a deed containing a special warranty, the insured would be conveying no more than what it received from its grantor, and coverage would end with the conveyance.

*Id.* at 763–64.

¶ 17 Applying those principles, the court held there was no coverage for the cost the insured incurred in trying to clear title to the Miller tract because under the special warranty deed by which the insured had conveyed the tract, upon the sale, the title defect became the new owner's problem. *Id.* at 74. But the court came to a different conclusion about the insured's demand that the insurer

defend it in the trespass action. The court held the insurer was obligated to defend because the alleged trespass occurred during the time the insured owned the Miller tract. *Id.* at 765. It did not matter that the insured no longer owned the property by the time the insured made the claim for coverage; the relevant date was the date of the claimed injury. *Id.* at 765–66.

¶ 18 The same is true here. As relevant, the policy generally only covers loss or damage incurred during the period of ownership, but it does not require the insured to make such a claim before it sells the affected property. *Id.* at 766 ("The policy, rather than providing insurance for any 'claim' asserted during the policy period, provides that it covers any 'loss or damage during the policy period.' "). Moreover, contrary to Lawyer's Title's argument, it is irrelevant that Centennial's demand for coverage was not triggered by a third-party trespass or other title claim. The policy insures "against loss or damage" caused by an "encumbrance on the title." It does not require that Centennial be sued or subjected to a threat of suit.

¶ 19 Cases interpreting similar "continuation of insurance" provisions make clear the distinction between the two holdings by the *Chicago Title* court. Unless the insured remains subject to liability under a warranty deed, coverage does not continue in force for damages incurred from defects discovered after the insured conveys the property. *See Chicago Title,* 355 F.3d at 764–65; *Point of Rocks Ranch,* 146 P.3d at 680 ("the [insureds] are not entitled to recover under the policy for the easement discovered *after* they had conveyed the real property"); *Gebhardt Family Inv., L.L.C. v. Nations Title Ins. of New York, Inc.,* 132 Md.App. 457, 752 A.2d 1222, 1227 (2000) (any loss would be suffered by the new owner because the property was conveyed by special warranty deed).

¶ 20 Here, however, the loss Centennial alleges was sustained when it discovered the defect in title, at a time when it owned all 75 acres. Because Centennial owned the property at the time it allegedly incurred the loss, its damage claim is not barred by the "continuation in force" provision of the policy. *See generally Sandler v. New Jersey Realty Title Ins. Co.,* 36 N.J. 471, 178 A.2d 1, 6 (1962) ("Where the insured had an insurable interest at the time of making the contract, a change of title to the property insured does not automatically void the policy, if at the time of loss the insured has such an insurable interest. Such a result is attained only by a policy provision to that effect.").

¶ 21 The cases Lawyer's Title cites are inapposite. In *Gebhardt,* the insureds sold the property, then sued the insurer for failing to resolve a cloud on title discovered prior to the sale. 752 A.2d at 1223. Although the insureds argued they suffered the loss before they conveyed the property, they conceded on appeal that they had not yet suffered any monetary damages. *Id.* at 1227. Likewise, in *Willow Ridge Ltd. Partnership v. Stewart Title Guaranty Co.,* 706 F.Supp. 477 (S.D.Miss.1988), the trial court rejected the property owner's contention that the insurer was liable for damage incurred when the property was foreclosed upon; the court held that contrary to the owner's argument, the foreclosure was caused by the insured's failure to service the debt, not by any cloud on title. *Id.* at 484–85. And in *Point of Rocks Ranch,* the insureds' claim was based on a cloud on title they did not discover until after they had sold the property. 146 P.3d at 678, 680. By contrast to this case, the insureds there did not contend they suffered any damages while the policy continued in force.[3]

¶ 22 We hold that under the "continuation of insurance" provision of the policy, Centennial's sale of the affected property does not bar its claim for damages it alleges it incurred prior to the sale. The parties' summary judgment briefing did not address Centennial's ability to prove the damages it

---

**3.** Lawyer's Title also cites *Resolution Trust Corp. v. American Title Insurance Company,* 901 F.Supp. 1122 (M.D.La.1995), in which the court granted summary judgment to a title insurer on a claim brought by a former note holder. The note holder had argued that a cloud on title prevented it from being able to foreclose. Although the court held the plaintiff's claim was barred because it was no longer an insured under the policy, the court did not address whether a claim could be made for damages allegedly suffered while the policy continued in force.

alleges or its obligation to mitigate those damages; nor did the briefing address any other policy defenses Lawyer's Title might raise (including the timeliness of Centennial's claim) to coverage. We do not express any view on any of these issues, which the parties may raise on remand.

## CONCLUSION

¶ 23 For the foregoing reasons, we affirm summary judgment in Lawyer's Title's favor as to the negligence claim, but reverse and remand for further proceedings the judgment in favor of Lawyer's Title on Centennial's claim for breach of contract. We also reverse the superior court's order awarding Lawyer's Title attorney's fees and costs pursuant to A.R.S. § 12–341.01 (West 2013). We decline to grant attorney's fees or costs to either party on appeal. *See Chapman v. The Westerner,* 220 Ariz. 52, 55, ¶ 15, 202 P.3d 517, 521 (App.2008). The superior court, however, may consider the fees incurred in this appeal in determining whether and how much to award the prevailing party at the close of the case. *See Lennar Corp. v. Transamerica Ins. Co.,* 227 Ariz. 238, 247, ¶ 32, 256 P.3d 635, 644 (App.2011).

CONCURRING: MARGARET H. DOWNIE, Acting Presiding Judge, and JOHN C. GEMMILL, Judge.