Bales, C.J.,
dissenting.
¶ 50 I agree with the majority that the title insurance policy is facially ambiguous regarding the proper date (policy issuance versus foreclosure) on which to measure an insured lender’s loss when an undisclosed title defect, lien or encumbrance (a “title defect”) reduces the value of property securing a loan. Supra ¶ 18.1 also agree that the diminution in value generally is measured as of the date of foreclosure. Supra ¶ 47. Because I believe the same date should be used in the circumstances of this case, I respectfully dissent.
¶ 51 The majority holds that the drop in value should be measured as of the policy’s issuance when an undisclosed title defect prevents the known, intended use of the property and causes the borrower to default. Supra ¶¶ 1, 28. Recognizing that this approach shifts to the title insurer “loss[es] attributable to [a] market downturn (which could occur irrespective of any title defect or error in the title search),” id. ¶ 28, the majority concludes that this result “offends neither the policy language nor the relevant, identified social policies.” Id. The majority’s holding rests on its repeated observations that First American “failed” to discover and disclose the restrictive covenants for the subject property or that it conducted a “deficient” or “incomplete” title search when First American offered to extend title coverage before Johnson Bank issued loans to its borrowers. Supra ¶¶ 1, 2, 24,29.
¶ 52 Loss under the policy should not be measured by imputing duties to the title insurer that are inconsistent with the policy itself and Arizona’s statutory framework. Although the policy may be facially ambiguous with regard to the date of valuation for calculating loss, the nature of the parties’ transaction as well as the policies reflected in Arizona’s title insurance statutes resolve that ambiguity: absent a contrary indication by the parties, loss should be measured as of the date of foreclosure. Cf. First Am. Title Ins. Co. v. Action Acquisitions, LLC, 218 Ariz. 394, 397 ¶ 8, 187 P.3d 1107, 1110 (2008) (discussing how facial ambiguity of insurance policy may be resolved by “looking to legislative goals, social policy, and the transaction as a whole”).
¶ 53 Title insurance, as the parties acknowledge, is a contract of indemnity, not a guarantee of title. E.g., Centennial Dev. Grp. LLC v. Lawyer's Title Ins. Corp., 233 Ariz. 147, 149 ¶ 6, 310 P.3d 23, 25 (App. 2013); Associated Bank, N.A. v. Stewart Title Guar. Co., 881 F.Supp.2d 1058, 1066 (D. Minn. 2012). A title insurer cannot “fail” to disclose title defects to a lender seeking title insurance unless it owes a duty to the lender to discover and disclose such defects when it offers to provide coverage on a property. See Centennial Dev. Grp., 233 Ariz. at 150 ¶¶ 9-10, 310 P.3d at 26; First Midwest Bank, N.A. v. Stewart Title Guar. Co., 218 Ill.2d 326, 300 Ill.Dec. 69, 843 N.E.2d 327, 335 (2006); Barstad v. Stewart Title Guar. Co., Inc., 145 Wash.2d 528, 39 P.3d 984, 987-88 (2002).
¶ 54 Courts have consistently recognized that a title insurer has no implied duty to search title records for defects when it contracts to provide title insurance. E.g., Hulse v. First Am. Title Co. of Crook Cnty, 33 P.3d 122, 134-35 (Wyo. 2001); Barstad, 39 P.3d at 990-91; Greenberg v. Stewart Title Guar. Co., 171 Wis.2d 485, 492 N.W.2d 147, 151-52 (1992); Lawrence v. Chicago Title Ins. Co., 192 Cal.App.3d 70, 76-77, 237 Cal.Rptr. 264 (1987). Therefore, any duty to investigate the condition of title can result only from a voluntary assumption of that duty in addition to the mere contract to insure title. Hulse, 33 P.3d at 134-36; Greenberg, 492 N.W.2d at 152. If a title insurer undertakes no contractual duty to discover or disclose title defects *359 to a lender when it offers to provide title insurance, then a lender could not reasonably expect such an offer to serve as any kind of guide regarding “the value of the lender’s security interest,” supra ¶ 29, or as a hedge against the risk of market downturns. See First Midwest Bank, N.A., 300 Ill.Dec. 69, 843 N.E.2d at 335.
¶ 55 Under Arizona law, a duty to discover or disclose title defects is imposed by an abstract of title, not by a title insurance policy. See A.R.S. § 20-1562(1) (requiring an abstract of title to disclose “all recorded conveyances, instruments or documents that impart constructive notice with respect to the chain of title to the real property”). When a title insurer offers to provide title insurance for a property, it issues a title commitment. See § 20-1562(5) (defining “title commitment” as an offer to issue a title insurance policy subject to any stated exceptions). Once escrow closes and the loan documents have been recorded, a title policy is issued based on the precise terms of the title commitment. See § 20-1562(11) (defining “title insurance policy” as the means by which title insurance liability is accepted); see also Palomar, 1 Title Ins. Law § 5:29. Unlike an abstract of title, a title commitment is explicitly exempted from any duty to discover or disclose title defects. § 20-1562(5) (“the rights, duties and responsibilities relating to the preparation and issuance of an abstract of title do not apply to the issuance of a [title commitment]. The [title commitment] is not a representation as to the condition of title to real property”). The parties, of course, are free to contract around these statutory definitions, but we are not so free to ignore our statutory scheme. See e.g., Tower Plaza Investments Ltd. v. DeWitt, 109 Ariz. 248, 253, 508 P.2d 324, 329 (1973) (the laws of a state are part of a contract and must be read into it).
¶ 56 Our sister courts in Washington and California—which share the same statutory definitions of “abstract of title,” “title commitment,” and “title insurance policy” as Arizona—have reached similar conclusions. The Supreme Court of Washington, after discussing the same statutory differences between an abstract of title, title commitment, and title policy that are present here, expressly held that a title insurer owes no duty to a lender to discover or disclose any information regarding the condition of title when it offers to provide title insurance. Barstad, 39 P.3d at 988-89, 991. Barstad emphasized that the party seeking title insurance has no reasonable expectation to any information concerning the condition of title for the subject property, and that any research conducted by the insurer was exclusively for its own benefit, not for the benefit of the insured. Id. at 990-91.
¶ 57 Similarly, California’s Court of Appeal has recognized that the statutory definitions of “abstract of title,” “title commitment,” and “title insurance policy”—which are virtually identical to Arizona’s—preclude courts from imposing a duty on a title insurer to discover and disclose title defects when it contracts for title insurance. E.g., Siegel v. Fid. Nat’l Title Ins. Co., 46 Cal.App.4th 1181, 1189, 1193, 54 Cal.Rptr.2d 84 (1996). The statute makes clear that a title policy is “not a summary of the public records, and the insurer is not supplying information” regarding the condition of title to the insured. Lawrence, 192 Cal.App.3d at 75, 237 Cal.Rptr. 264. Like Washington, any title search that an insurer chooses to conduct is strictly for the insurer’s own benefit and has no bearing on the insured. Fid. Nat’l Title Ins. Co. v. Miller, 215 Cal.App.3d 1163, 1175 (1989).
¶ 58 Under Arizona’s statutory framework and the policy at issue here, First American did not undertake a duty to discover any title defects or disclose them to Johnson Bank before the lender made the loan. Accord Hulse, 33 P.3d at 134-36; Barstad, 39 P.3d at 988-91. Instead, the insurer agreed that if an undisclosed title defect was later discovered and caused “actual monetary loss” to the lender, First American would pay the lesser of: the unpaid loan balance, the cost of curing the title defect, or the diminution in value resulting from the defect. The appropriate date for calculating loss in this context is when it in fact occurred—the date of foreclosure.
¶ 59 The majority’s conclusion that loss may be measured as of policy issuance is both self-contradictory and inconsistent with the nature of title insurance under Arizona *360 law. The majority acknowledges that a lender’s title insurance policy is not a guarantee of title, supra ¶ 21, and denies imposing any “extra-contractual duties” on the insurer. Supra ¶ 47. Nonetheless, the majority asserts that measuring loss as of the date of issuance is appropriate because the insurer conducted a “deficient title search” and its failure to disclose the defect caused “actual consequential damages” to the lender. Supra ¶¶ 24, 26. This can only mean that the lender was damaged because the insurer breached some duty (contractual or otherwise) to properly investigate title and disclose it to the lender before the loan was funded. (The treatise cited by the majority in support of measuring loss by the policy date, supra ¶ 28, does not address Arizona’s statutory framework and fails to adequately distinguish between a lender’s policy and an owner’s policy, as the latter might warrant using date of issuance to measure loss, since the owner’s equity is immediately impaired by the undisclosed defect.) The majority argues that cases or statutes like A.R.S. § 20-1562(5) recognizing that a title policy is not a representation about the condition of title are inapposite because Johnson Bank is not asserting claims based on tort or the title commitment. Supra ¶¶ 47, 48. The relevant point is not the nature of the claims asserted by the lender, but instead whether the title insurer had any duty to discover and disclose the title defects, as the majority’s analysis presumes.
¶ 60 Based on a mistaken characterization of a title insurer’s responsibilities to a lender, the majority ultimately concludes that it will construe the “ambiguous” policy in favor of the insured, and thereby allow the lender to measure loss as of the date of policy issuance if the defect “caused the borrowers/owners to default on Johnson Bank’s loans.” Supra ¶ 37. To do otherwise, the majority states, would allow the insurer to “unfairly” avoid paying the lender’s damages. Supra ¶ 26.
¶ 61 I respectfully disagree. Because First American did not undertake by issuing title insurance to then discover any title defects or disclose them to the lender, it is not appropriate to adopt a measure of loss (date of policy issuance) that presumes such duties. If the lender wanted some representation regarding the condition of title it could have purchased an abstract of title; similarly, if it wanted to shift the risk of market loss (an underwriting risk generally born by lenders rather than title insurers), it might have contracted to do so. We should not, however, interpret the title policy as implicitly adopting a measure of loss that does not comport with the expressed intent of the parties, the nature of title insurance, or Arizona’s policy as expressed in our title insurance statutes.