******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

FIRST AMERICAN TITLE INSURANCE COMPANY
*v.* 273 WATER STREET, LLC, ET AL.
(AC 35882)

Lavine, Beach and Keller, Js.

*Argued October 23, 2014—officially released May 5, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Peck, J. [motion to dismiss]; Vacchelli, J.
[motion in limine; judgment; motions to set aside verdict
and for remittitur]).

*Courtney G. Saleski*, pro hac vice, with whom were
*Benjamin Berger* and, on the brief, *David R. Makare-
wicz* and *Richard M. Kremen*, pro hac vice, for the
appellant (plaintiff).

*Wesley W. Horton*, with whom were *Brendon P. Lev-*

*esque* and, on the brief, *Karen L. Dowd*, for the appel-
lees (defendants).

*Opinion*

BEACH, J. In this declaratory judgment action, the plaintiff, First American Title Insurance Company, appeals from the judgment, rendered after a jury trial, in favor of the defendant developers, 273 Water Street, LLC, and Fenwick Acquisition, LLC. The plaintiff claims that (1) the defendants lacked standing to pursue, and the trial court lacked subject matter jurisdiction to hear, their counterclaims; (2) the trial court abused its discretion with respect to several evidentiary rulings; and (3) the court abused its discretion in denying its motion to set aside or to reduce the verdict. We affirm the judgment of the trial court.

The following facts, which reasonably could have been found by the jury, and procedural history are relevant. On September 27, 2004, the defendants purchased the subject property for $6 million. The property, consisting of approximately 3.5 acres, had been the beachfront summer home of actress Katharine Hepburn. The property was located in the town of Old Saybrook and the Borough of Fenwick (borough). The property had 600 feet of frontage on Long Island Sound and was bordered on one side by a pond and on another by a land trust. The subject property previously had been larger, but prior to the sale of the property to the defendants, the Hepburn estate donated the eastern portion of the property to a land trust.

When the defendants purchased the property, they also purchased a title insurance policy (policy) from the plaintiff. The defendants subdivided the property into three lots. The house was on the center lot. There had been plans to build smaller houses on the easterly and westerly lots to create a family compound. The three lots were on the market at the time of trial for a total asking price of $30 million.

Shortly after the defendants began renovating the property, an official from the borough notified the defendants, by letter dated February 18, 2005, that the borough claimed ownership of a thirty foot wide discontinued road. The road ran from Mohegan Avenue, through part of the property's driveway, over a portion of the lawn, and ended at a waterfront rock jetty. The parties agreed that February 18, 2005, constituted the date of loss under the title insurance policy.

On August 15, 2007, the defendants submitted a claim to the plaintiff title insurance company. The plaintiff approved the claim and issued a check to the defendants in the amount of $17,000 on October 8, 2008. The defendants refused to accept the check because, in the defendants' opinion, the loss amounted to approximately $5 million.

In November, 2008, the plaintiff initiated this action seeking a declaratory judgment of its rights and obligations under the policy. In an amended complaint, the

plaintiff sought a declaration that its obligations under the policy would be satisfied by a payment of $40,000 or less. The defendants filed a counterclaim alleging breach of contract and breach of the implied covenant of good faith and fair dealing, and sought a counter-declaratory judgment without a limit on the amount of recovery.

During the course of litigation, in March, 2010, the parties negotiated with the borough and reached an accommodation regarding the road. The borough agreed to convey fee title to the thirty foot discontinued road to the defendants, who in turn conveyed to the borough a limited six foot wide easement in the same area. The easement allowed access residents of the borough by foot and by bicycle between the hours of 5 a.m. and midnight. Running along the eastern side of the east lot next to the land donated to the land trust, the easement was approximately eighty yards from the house. It was a footpath that was not marked, maintained or advertised, but was used by some people.

The case was tried. A jury returned a verdict in favor of the defendants on their counterclaim for breach of contract and for a declaratory judgment. The jury awarded the defendants $2.2 million in damages. The jury found against the plaintiff on its request for a declaratory judgment and found against the defendants on their counterclaim alleging breach of the implied covenant of good faith and fair dealing. The plaintiff filed a motion to set aside or to reduce the verdict, which the trial court denied. The court rendered judgment in accordance with the jury's verdict, plus costs. This appeal followed. Additional facts will be set forth as necessary.

I

The plaintiff first claims that the defendants lacked standing to pursue, and thus the trial court lacked subject matter jurisdiction to hear, their counterclaims. It argues that the court erred in denying its motion to dismiss, which claimed lack of standing. We disagree.

"It is well established that [i]f a party is found to lack standing, the court is without subject matter jurisdiction to determine the cause. . . . A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record. . . . [S]tanding is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy." (Citation omitted; internal quotation marks omitted.)

*Perry* v. *Perry*, 312 Conn. 600, 626–27, 95 A.3d 500 (2014). "A determination regarding a trial court's subject matter jurisdiction is a question of law. When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Fairchild Heights Residents Assn., Inc.* v. *Fairchild Heights, Inc.*, 310 Conn. 797, 821, 82 A.3d 602 (2014). "The issue of standing implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss. Practice Book § [10-30 (a)]." (Internal quotation marks omitted.) *McWeeny* v. *Hartford*, 287 Conn. 56, 63, 946 A.2d 862 (2008).

The following additional undisputed facts and procedural history are relevant. On May 23, 2011, the defendants transferred the easterly portion of the property, which contained the easement, by quitclaim deed to A Piece of Paradise, LLC (Paradise).[1] The plaintiff moved to dismiss the defendants' counterclaims on the ground that the defendants lacked standing, because the portion of the property containing the easement (easterly lot) had been transferred to a third party, Paradise, thereby terminating the policy as to that portion of the property. The court denied the motion to dismiss and concluded that the defendants had standing to bring their counterclaims. The court noted that, pursuant to the unambiguous language of the policy, relevant coverage ended on May 23, 2011, when the defendants conveyed title to the easterly lot to Paradise. The defendants submitted the claim to the plaintiff in August, 2007. The court reasoned that the policy was ambiguous as to the intention of the parties concerning preexisting claims for damages allegedly incurred prior to the termination of the policy, and any ambiguity was to be resolved in favor of the insured. Claims arising during the policy period, then, were not necessarily defeated by a subsequent transfer of property to a third party.

Paragraph 7 of the policy provided: "This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy . . . ." The policy provided for title insurance coverage against "loss or damage . . . incurred by the insured by reason of . . . any defect in or lien or encumbrance on the title . . . ." Paragraph 2 provided: "The coverage of this policy shall continue in force as of the Date of Policy in favor of an Insured only so long as the Insured retains an estate or interest in the land . . . ." The policy defined "insured" as "the Insured named in Schedule A, and, subject to any rights or defenses the Company would have had against the named insured, those who succeed to the interest of the named insured by operation of law as distinguished from purchase including, but not

limited to, heirs, distributes, devisees, survivors, personal representatives, next of kin, or corporate fiduciary successors." Schedule A named the defendants as the insureds.

It is undisputed that policy coverage as to the lot encumbered by the easement ended when the defendants conveyed title to the easterly lot to Paradise on May 23, 2011, and as of that date the defendants no longer "retain[ed] an estate or interest in the land" under paragraph 2. The policy provided for coverage to the insured defendants for "actual monetary loss or damage . . . incurred by the insured by reason of . . . any defect in . . . title" during the policy period. It is also undisputed that the defendants, who purchased the policy in September, 2004, were covered by the policy when the plaintiff was notified, on February 18, 2005, that the borough claimed ownership to the thirty foot wide discontinued road on the easterly side of the property. The parties dispute whether, in this scenario, the defendants suffered an "actual loss" within the policy period, and, thus, whether they were harmed such that they had standing to pursue a counterclaim for damages.

The plaintiff contends that the policy unambiguously provided that the insured must "sustain or incur" "actual monetary loss or damage" during the policy period in order to recover under the policy. The plaintiff argues that the defendants had transferred the easterly portion to Paradise before they sustained an actual monetary loss or damage as a result of the six foot easement, and thus did not have standing to assert counterclaims against the plaintiff.

In their counterargument, the defendants maintain that the court found, in its decision on the plaintiff's motion to set aside the verdict, that the parties had agreed that February 18, 2005, was the date of loss. This fact was also found by the court in its ruling on the motion to dismiss. In its reply brief, the plaintiff argues that it did not waive its claim concerning standing by stipulating as to date of loss. It argues that it never stipulated that there was an actual monetary loss, but, rather, it was "forced to proceed" with litigating the case after the trial court denied its motion to dismiss, and thus it "was necessary to determine the date that the jury would use to monetize the diminution in value of the property—i.e., the legal date of loss—if and only if the jury found that there was a loss at all." The plaintiff argues that the defendants did not lose ownership of the land comprising the discontinued road on February 18, 2005, but rather the letter from the borough notified the defendants of an alleged title defect on that date.

We do not disagree with the plaintiff as to its denial of waiver. We hold, however, that the plaintiff cannot prevail on its contention that the defendants lack stand-

ing on the ground that they did not suffer a monetary loss under the insurance policy on February 18, 2005, because the defendants asserted in their counterclaims a colorable claim of direct injury. The plaintiff argues that the defendants' assertion in their counterclaim that they "have been and continue to be financially harmed in an amount to be determined at trial" is speculative and does not amount to an actual loss. The defendants, however, were not required to prove their claim in order to establish standing, but, rather, were required to make a colorable claim. See *Perry* v. *Perry*, supra, 312 Conn. 627 ("[S]tanding is not a . . . a test of substantive rights. Rather it is a practical concept designed to ensure that courts and parties are not vexed by suits brought to vindicate nonjusticiable interests and that judicial decisions which may affect the rights of others are forged in hot controversy, with each view fairly and vigorously represented. . . . These two objectives are ordinarily held to have been met when a complainant makes a colorable claim of direct injury he has suffered or is likely to suffer, in an individual or representative capacity. Such a personal stake in the outcome of the controversy . . . provides the requisite assurance of concrete adverseness and diligent advocacy." [Citation omitted; internal quotation marks omitted.]). The defendants alleged colorable claims for all of the counterclaims: breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment. They alleged a defect in title and diminution in value of the property because of the borough's assertion of ownership of a strip of the property. The amount of the loss suffered, if any, under the policy was a question of fact to be resolved by the jury at trial. The jury ultimately found that the defendants suffered a loss under the insurance policy.

The plaintiff argues that the present case is indistinguishable in any material way from *Gebhardt Family Investment, LLC* v. *Nations Title Ins. of New York, Inc.*, 132 Md. App. 457, 752 A.2d 1222, cert. denied, 360 Md. 486, 759 A.2d 231 (2000) (*Gebhardt*). In *Gebhardt*, the individual plaintiffs purchased more than thirty acres of land and, at the same time, purchased title insurance from the defendant insurer. Id., 459. A few years later, the individual plaintiffs discovered that another entity was paying property taxes on 4.75 acres of the property. Id. The individual plaintiffs reported the cloud on title to the defendant and demanded that the defendant obtain a quitclaim deed to the 4.75 acres from the third party in favor of the plaintiffs. Id. Before the matter was resolved, the plaintiffs transferred the entire property to a limited liability company, of which the plaintiffs were the sole members. Id., 460. Following the transfer, the individual plaintiffs and their limited liability company sued the defendant for breach of contract for failing to resolve the cloud on title. Id. The trial court determined that the plaintiffs' coverage under

the policy terminated with the transfer of the property to the limited liability company and rendered judgment in favor of the defendant. Id., 461. The judgment was affirmed on appeal. Id., 466. The court noted that the plaintiffs had admitted in their brief that there had not yet been a monetary loss and reasoned that if any loss were to be suffered, it would be suffered by the limited liability company. Id. In *Gebhardt*, then, the insured admitted that there had been no monetary loss during the policy period. Although the court determined, because of the admission by the insureds, that they suffered no monetary loss and thus could not recover, the issue of standing to bring a claim under the policy, alleging monetary loss in such a situation, was not raised. *Gebhardt*, then, does not hold that a transfer of the property necessarily prevents the transferor from recovering against its insurer and does not specifically address the situation in which a loss of property value has been caused while the insured owns the affected premises.

The plaintiff in the present case does not claim that a subsequent termination of the policy defeats an insured's ability to maintain a claim for actual monetary loss that occurs during the policy period, but, rather, agrees that an insured "clearly can so recover." We agree as well. The policy itself also does not state that the ability to claim a loss terminates with the transfer of ownership; rather, it unambiguously provides for title insurance coverage against "loss or damage . . . incurred by the insured by reason of . . . any defect in or lien or encumbrance on the title." Coverage for loss occurring after the transfer of ownership, however, is terminated by the transfer of ownership. The policy provides: "The coverage of this policy shall continue in force as of the Date of Policy in favor of an Insured only so long as the Insured retains an estate or interest in the land . . . ."

The case of *Centennial Development Group, LLC* v. *Lawyer's Title Ins. Corp.*, 233 Ariz. 147, 310 P.3d 23 (App. 2013), review denied, Arizona Supreme Court, Docket No. CV-13-0354-PR (April 22, 2014) (*Centennial*), involved similar facts and contract language. In that case, the plaintiff purchased seventy-five acres of land and obtained title insurance from the defendant. Id., 148. Approximately one year after the closing date, the plaintiff discovered a roadway and utility easement across its property that the defendant had not disclosed. Id. The plaintiff reconveyed all but one acre back to the prior owner; the easement did not burden the one acre the plaintiff retained. Id. The plaintiff sued the defendant for negligence and breach of contract. Id. The trial court granted summary judgment in favor of the defendant as to both counts. Id. The policy in *Centennial* insured the plaintiff " 'against loss or damage . . . sustained or incurred . . . by reason of . . . [a]ny defect in or lien or encumbrance on the title' "

subject to the following condition: " 'The coverage of this policy shall continue in force as of Date of Policy in favor of an insured only so long as the insured retains an estate or interest in the land.' " Id., 150. The Arizona appellate court determined that the defendant referenced "no policy language that requires [that] the insured own the affected property at the time it makes a claim. While the policy makes plain that coverage continues only so long as the insured owns the property, it contains no similar restriction on when an insured may file a claim. See Burke, Law of Title Insurance § 5.02 (3d. ed. Supp. 2012) ('post-coverage claim' may be made on a title insurance policy 'so long as the damages were sustained during coverage')." *Centennial Development Group, LLC* v. *Lawyer's Title Ins. Corp.*, supra, 151.

The court in *Centennial* continued: "[T]he loss [the plaintiff] alleges was sustained when it discovered the defect in title, at a time when it owned all 75 acres. Because [the plaintiff] owned the property at the time it allegedly incurred the loss, its damage claim is not barred by the 'continuation in force' provision of the policy. See generally *Sandler* v. *New Jersey Realty Title Ins. Co.*, 36 N.J. 471, 178 A.2d 1, 6 (1962) ('Where the insured had an insurable interest at the time of making the contract, a change of title to the property insured does not automatically void the policy, if at the time of loss the insured has such an insurable interest. Such a result is attained only by a policy provision to that effect'). . . . We hold that under the 'continuation of insurance' provision of the policy, [the plaintiff's] sale of the affected property does not bar its claim for damages it alleges it incurred prior to the sale." (Citations omitted.) *Centennial Development Group, LLC* v. *Lawyer's Title Ins. Corp.*, supra, 233 Ariz. 152; see also *Chicago Title Ins. Co.* v. *100 Investors Ltd. Partnership*, 355 F.3d 759, 763 (4th Cir. 2004) (when same tract of land was conveyed to insured and to third party, Fourth Circuit determined, applying Maryland law, that insurance company had duty to defend insured against third party's claim of trespass where actual loss occurred during policy period and prior to termination of policy despite fact that insured had subsequently conveyed the property to another, but insurance company had no duty to reimburse insured for moneys spent in repurchasing the land after policy had terminated); Joyce D. Palomar, 1 Title Insurance Law § 8:22 (2014-15 Ed.) ("[w]hile a transfer of title terminates future coverage, so long as the insured held title at the time of its loss, the insured's subsequent transfer of title does not terminate its pre-existing claim" [emphasis omitted]).

In the present case, the alleged loss of property value occurred during the policy period. The defendants, then, have standing to assert their counterclaims despite the fact that the policy was terminated as to

that property subsequent to the loss because of the transfer of the relevant portion of the property to a third party.

## II

The plaintiff next claims that the court abused its discretion in making several evidentiary rulings that substantially prejudiced the plaintiff. We disagree.

We first set forth our standard of review. "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . [E]videntiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice." (Internal quotation marks omitted.) *Stokes* v. *Norwich Taxi, LLC*, 289 Conn. 465, 489, 958 A.2d 1195 (2008).

## A

The plaintiff claims that the court erred in admitting into evidence opinion testimony of Frank Farricker, a witness for the defendants, regarding his theory of "celebrity enhancement." It argues that the court should have conducted a *Porter*[2] hearing and should have excluded Farricker's testimony because it was based on "junk science." The plaintiff argues, alternatively, that Farricker's celebrity enhancement testimony should have been excluded by the trial court because it was more prejudicial than probative. We disagree.

Prior to trial, the court heard arguments on the plaintiff's motion in limine, filed pursuant to Practice Book § 15-3, to preclude the testimony of Farricker. At the hearing, the plaintiff's counsel argued that Farricker should have been precluded from testifying as to his celebrity enhancement theory because it was not the type of expert analysis that has been recognized to be proper under *Porter*. It further argued that Farricker, a licensed real estate broker, was not qualified to testify as an expert in celebrity enhancement. The court stated: "And I assume you're requesting a *Porter* hearing regarding this, and this is your *Porter* hearing. Am I correct?" The plaintiff's counsel replied: "If Your Honor feels this is necessary under the motion in limine, it's my understanding that . . . we certainly are prepared to proceed if need be." The defendants' counsel argued that Farricker's testimony contemplated his opinion as to real estate values rather than to arcane, scientific matters, and therefore neither a *Porter* hearing nor preclusion was required. The court denied the plaintiff's motion. The court stated: "I don't think it is necessary to hold a *Porter* hearing in this case. . . . We let property owners give a value for their own property, and . . . there is certainly nothing scientific about that and this is far removed from that, comparable to an appraiser, and we will have appraisers testifying in this case. And I think he can testify on the same basis. Now

that's not to say that there are not credibility issues here, and fertile grounds for cross-examination concerning possibly his qualifications and the validity of his conclusions, but that doesn't go to whether this must be excluded under *Porter*. So I won't preclude him from testifying."

Farricker was found to be qualified as an expert witness on the subject of real estate values, and he testified that celebrity status of a property "can greatly affect its value." He further testified that the celebrity status of the Hepburn home enhanced the property's value, so that its market value was greater than its value as determined by standard methods of appraisal.

"Our standard for admitting expert testimony is well established. In *Porter*, our Supreme Court explicitly adopted the *Daubert*[3] test to determine the admissibility of scientific evidence . . . [but it] did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. . . . Courts apply the *Daubert* standard only when such testimony involves innovative scientific techniques . . . ." (Footnote added; internal quotation marks omitted.) *State* v. *Campbell*, 149 Conn. App. 405, 429, 88 A.3d 1258, cert. denied, 312 Conn. 907, 93 A.3d 157 (2014). "In *Daubert*, the United States Supreme Court charged federal trial judges to act as gatekeepers regarding the reasoning or methodology behind scientific evidence so as to exclude from admission any unreliable evidence and related expert testimony. . . . [In *Porter*, our] Supreme Court adopted the *Daubert* approach regarding the threshold admissibility of scientific evidence. . . . Although federal courts have applied the *Daubert* gatekeeping function as to the admission of all expert testimony, not just testimony based in science . . . Connecticut has never adopted that expansion of the *Daubert* holding." (Citations omitted; internal quotation marks omitted.) *Banco Popular North America* v. *Du'Glace, LLC*, 146 Conn. App. 651, 658, 79 A.3d 123 (2013).

The plaintiff argues that a *Porter* hearing was necessary because Farricker's testimony was based on an innovative scientific technique. The plaintiff further contends that because Farricker's testimony on celebrity enhancement theory constituted "junk science" it should have been excluded. We disagree.

Farricker's proposed testimony concerned a real estate appraisal. "[A] real estate appraisal is not scientific evidence . . . ." Id. His testimony was premised on a human factor that was readily observable and understandable. *State* v. *Vumback*, 68 Conn. App. 313, 330, 791 A.2d 569 (2002) ("[i]f an expert's testimony concerns a method, the understanding of which is accessible to the [trier of fact] . . . the testimony is not scientific . . ." [internal quotation marks omitted]), aff'd, 263 Conn. 215, 819 A.2d 250 (2003). It was not the type of potentially misleading evidence contemplated

in *Porter* to be subject to the *Daubert* test. See id. Accordingly, a hearing as to the admissibility of the evidence was not required by *Porter*, and the trial court did not improperly refuse to exclude the evidence on the ground that a *Porter* hearing should have been held.

The plaintiff argues in the alternative that the court erred in failing to exclude Farricker's celebrity enhancement testimony because it was more prejudicial than probative. It argues that the celebrity enhancement testimony aroused the emotions of the jury and left the jury with the impression that the value of the property was enhanced by "some amorphous amount." We are not persuaded.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging [to the party seeking its exclusion] but whether it will improperly arouse the emotions of the jur[ors]." (Internal quotation marks omitted.) *State* v. *Kalil*, 314 Conn. 529, 548, 107 A.3d 343 (2014).

A real estate appraisal based in part on a celebrity enhancement theory is not likely improperly to arouse the emotions of the jury. It was not likely to arouse in the jury feelings of hostility or sympathy, nor did it reflect unfavorably on the plaintiff. It concerned only the value of the property, which, of course, was at issue in the case. Further, the plaintiff was able to cross-examine Farricker on his method and conclusions, and the court sustained the plaintiff's objection to Farricker's giving his opinion as to the amount by which the value of the property was enhanced because of its former celebrity ownership. Accordingly, the court did not abuse its discretion in admitting the testimony.

B

The plaintiff claims that the court erred by excluding evidence of a claimed admission regarding the value of the property after the title defect had been reduced from the thirty foot discontinued road to a limited six foot easement. We are not persuaded that any error was harmful.

Frank Sciame, the owner of the defendants and, thus, indirectly of the property, also owned a construction company specializing in "very challenging, difficult projects" such as renovating and preserving sensitive historic properties. Sciame testified that he purchased the property for $6 million in 2005. He said he "got a great buy here because of the circumstances. It was a great opportunity to use the skill sets the company had. . . . I would believe it was worth the $12 million they

originally asked for it." He further testified that at the time of purchase the house was in disrepair: it had flood damage and mold, had sunk in the ground and was leaning. He purchased it for half the original list price and did not subject the purchase to an engineer's inspection "[b]ecause if anyone had bought that house and an engineer went in there, with the leaning and in the hole and then the flooding, they probably would fail the inspection, so I made it not subject to an engineer's inspection and they accepted the offer." The parties stipulated that at the time of trial in 2013 the property was on the market for $30 million.

During cross-examination of Sciame, the plaintiff sought to introduce as a full exhibit a letter from Sciame to the residents of the borough, dated June 6, 2011. In that letter, Sciame informed the residents of the listing of the property for sale, in the event that any resident had an interest in purchasing the property. Sciame informed the residents that he and his wife would be offering the 1.47 acre parcel on which the Hepburn home was located for $18 million, the westerly lot for $4.5 million and the easterly lot for $5.5 million. Counsel for the defendants objected to the letter on the ground of relevancy. The defendants' counsel argued that the parties had agreed that "the house" was, as of the time of trial, in March, 2013, listed for sale at $30 million, and that the letter, which was dated June 6, 2011, was not relevant because it included contemplated sale prices that did not reflect the actual then-current listing price. The plaintiff's counsel argued that the letter was relevant to the valuation of the property because Sciame admitted in the letter that the value of the easterly lot was $5.5 million, even though it was burdened by the easement, and it tended to discredit Sciame's claim that the easterly lot had suffered a diminution in value of $4 to $5 million by virtue of the title defect, as ameliorated by the substitution of the easement. The plaintiff's counsel argued that the letter was relevant "to the credibility of the claim" because Sciame was claiming damages of $4 to $5 million at trial, yet two years earlier the easterly lot was being marketed for $5 million. In sustaining the objection by the defendants' counsel, the court stated: "well, if it [is] a credibility issue, it is a collateral topic."

"Evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. Conn. Code Evid. § 4-1. Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . One fact is relevant to another if in the common course of events the existence of one, alone or with other facts, renders the existence of the other either more certain or more probable. . . . Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to

support a relevant fact even to a slight degree, [as] long as it is not prejudicial or merely cumulative." (Internal quotation marks omitted.) *Reville* v. *Reville*, 312 Conn. 428, 461, 93 A.3d 1076 (2014).

"[T]he basic measure of damages . . . to real property is the resultant diminution in value. . . . In order to assess the diminution in value, however, the [trier of fact] must first determine the value of the property, both before and after the injury has occurred. . . . [N]o one method of valuation is controlling . . . ." (Citations omitted; internal quotation marks omitted.) *Ratner* v. *Willametz*, 9 Conn. App. 565, 584, 520 A.2d 621 (1987). "It is undisputed that homeowners are qualified to testify as to their personal opinion regarding the value, or diminution in value, of their properties." *Tessmann* v. *Tiger Lee Construction Co.*, 228 Conn. 42, 47, 634 A.2d 870 (1993). "Furthermore, [b]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result. . . . When judging the likely effect of such a trial court ruling, the reviewing court is constrained to make its determination on the basis of the printed record before it. . . . In the absence of a showing that the [excluded] evidence would have affected the final result, its exclusion is harmless." (Internal quotation marks omitted.) *Desrosiers* v. *Henne*, 283 Conn. 361, 366, 926 A.2d 1024 (2007).

The plaintiff argues that the letter would have provided the jury with Sciame's view of the value of the property, including the easterly lot, after the title defect had been mitigated. The evidence would have been relevant to a material issue in the case—the diminution in the value of the easterly lot due to the limited six foot easement. The plaintiff's counsel stated at trial that it was also relevant because it affected the credibility of Sciame's trial testimony regarding damages. Although the letter was relevant, the plaintiff cannot prevail on its claim because it has not shown that the exclusion of the letter from evidence was harmful.

The diminution in value caused by the easement was a central issue in the case. The letter, however, does not contain specifically an admission regarding market value, but rather includes Sciame's asking price in 2011. To the extent that the asking price was relevant, the failure of the court to admit the exhibit was not harmful. The jury had before it, in any event, the 2013 asking price of $30 million, which was $2 million more than the $28 million total asking price referenced in Sciame's letter in 2011. Both the 2011 and 2013 asking prices were for the whole property burdened by only the easement. The plaintiff argues that the letter was "directly relevant to the central issue of the case" and that counsel sought to admit the letter into evidence as a full

exhibit "to combat [Sciame's] valuation of the property subject to the limited six foot easement at $18 million (a figure which he calculated by reducing his valuation of the property at $24 million by 25 percent)." Sciame testified on redirect examination that in January, 2009, he believed that the house was worth $24 million after renovations and that the diminution in value caused by the title defect was between 20 to 30 percent of the unencumbered value, or about $6 million. This testimony, which was admitted at trial after the plaintiff's counsel sought to introduce the letter as a full exhibit, related to a valuation of the property in January, 2009, which was after notification of the discontinued road, but before the negotiation of the easement. The jury was instructed to determine the diminution in value caused by the easement. The jury had before it evidence that the plaintiff, in 2013, was asking $30 million for the entire property,[4] as encumbered by the easement.

The letter stated that Sciame anticipated placing the easterly lot on the market for $5.5 million. The fact that the jury did not have this evidence before it was not likely to have affected the result in light of other evidence presented to the jury regarding the valuation of the property as a result of the easement. In closing arguments, the parties focused on the expert appraisers and the issue of privacy. Evidence of Sciame's proposed asking price in 2011, as opposed to market value, was not central to the issues before the jury. The jury had before it evidence from the plaintiff's expert, Albert Franke, that the thirty foot discontinued road caused a diminution in value of $40,000, but that the limited six foot easement caused no diminution in value to the property. Robert Nocera, the defendants' expert witness, testified that the diminution in value to the property as a result of the road was approximately $4.1 million. He further testified that, although the impact of the easement was not "reflected necessarily in [his] analysis," the easement "diminishes, substantially, the uniqueness, the exclusivity, the privacy of this property to the point where major damages occur." For the foregoing reasons, we conclude that the failure of the court to admit the letter as a full exhibit was not harmful, because it was cumulative of other evidence and not directly material, because it was a suggestion of an asking price rather than a statement of actual market value.

### C

The plaintiff next claims that the court abused its discretion in "excessively limiting" the testimony of a real estate appraiser, Marc Nadeau. We do not agree.

Nadeau was hired by the plaintiff to assess the amount of the loss after the defendants filed their claim; Nadeau concluded that the amount of the loss was $17,000. Nadeau testified that he was a certified appraiser and that he provided the plaintiff with an

appraisal regarding the diminution in value of the property as a result of the discovery that the borough owned the discontinued road. He was asked on direct examination about an appraisal he performed regarding one of the subdivided lots at 10 Mohegan Avenue, at which point the defendants' counsel objected. The court excused the jury. The plaintiff's counsel withdrew Nadeau as an expert. The following colloquy occurred:

"The Court: So he is not going to be giving any opinion about what the value of anything is?

"[The Plaintiff's Counsel]: He is going to give an opinion—he's going to defend his appraisal is what he is going to do. And there was value in his appraisal. He's not going to opine on his appraisal, he's going to explain what he did  . . .

"The Court: Okay. Well, if he is not going to be giving an opinion about what the loss is, he's just going to be a fact witness stating what he did.

"[The Plaintiff's Counsel]: Well, he is going to be giving—

"The Court: —then I don't see any relevancy [to] all this other material. I thought you were building a background laying a foundation for his skill and capacity and knowledge of the area that he used in coming to his opinions.

"[The Plaintiff's Counsel]: But I am.

"The Court: But if he is not an opinion witness and he's not going to be giving an opinion, all that is not relevant.

"[The Plaintiff's Counsel]: But he will be giving an opinion.

"[The Defendants' Counsel]: He can't. You withdrew him as an expert. He can't give an opinion. He can only testify that he did an appraisal and here it is. . . . He can testify to the fact that [the plaintiff] asked him to do an appraisal and that he submitted it. He can't testify to anything else.

"The Court: That's what a fact witness would give, just the fact that he did it.

"[The Plaintiff's Counsel]: So he can't explain what he did in the undertaking the appraisal?

"The Court: Not unless he's been identified as an expert, and everyone knows he's going to be giving expert testimony.

"[The Plaintiff's Counsel]: But we are not proffering him as an expert, Your Honor.

"The Court: So he's just a fact witness, so objection sustained."

After the jury returned to the courtroom, Nadeau then testified that a representative of the plaintiff asked

him to appraise the loss in the value of the property caused by the borough's claim of ownership of the discontinued road. He testified about the process he used to appraise the property. When asked whether the claim of the borough to the discontinued road would affect the owner's ability to subdivide the parcel, the defendants' counsel objected on the ground that Nadeau was not an expert, but a fact witness. The court sustained the objection and stated that because Nadeau was not offered as an expert witness, "all he can testify about is . . . the fact of what he did." The plaintiff's counsel asked "if he is not allowed to explain what he does, does that mean that his appraisal will be immune from being criticized?" The court explained "Well, I guess if he is not giving any opinion, any hypotheticals to change his opinion would not be relevant or wouldn't be available either . . . to challenge his opinion." The court then said that expert testimony attacking Nadeau's appraisal would be admissible. The plaintiff's counsel asked: "But then could I bring him back to defend his own appraisal?" The court responded that "he would need to be an expert to do that. . . . [He] could explain what he did, but he wouldn't be able to explain [whether] it's shoddy or not." When asked by the plaintiff's counsel if the witness could explain his work, the court stated: "I'll have to . . . see the context. But if this witness is not offered as an expert, all I can see if he would testify about what he did; and is that your report? Yes, it is. Is that your signature? Yes, it is. That's the end of his . . . reasons for testifying." The plaintiff argues that the court erred in precluding Nadeau from explaining the methodology underlying his appraisal on the ground that he was not offered as an expert. The plaintiff contends that these limitations on Nadeau's testimony were "excessive" and its exclusion was prejudicial.

"Opinion evidence generally is inadmissible unless the witness is an expert." *Message Center Management, Inc.* v. *Shell Oil Products Co.*, 85 Conn. App. 401, 418, 857 A.2d 936 (2004). But "under prescribed circumstances, a lay witness may be competent to offer an opinion." *State* v. *Finan*, 82 Conn. App. 222, 228, 843 A.2d 630 (2004), rev'd on other grounds, 275 Conn. 60, 881 A.2d 187 (2005). Section 7-1 of the Connecticut Code of Evidence provides: "If a witness is not testifying as an expert, the witness may not testify in the form of an opinion, unless the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of the testimony of the witness or the determination of a fact in issue." "Section 7-1 is based on the traditional rule that witnesses who did not testify as experts generally were required to limit their testimony to an account of the facts and, with but a few exceptions, could not state an opinion or conclusion." (Internal quotation marks omitted.) *Message Center Management* v. *Shell Oil Products Co.*, supra, 85 Conn.

App. 419; see also *State* v. *Finan*, 275 Conn. 60, 65–66, 881 A.2d 187 (2005) ("[b]ecause of the wide range of matters on which lay witnesses are permitted to give their opinion, the admissibility of such evidence rests in the sound discretion of the trial court, and the exercise of that discretion, unless abused, will not constitute reversible error" [internal quotation marks omitted]). "Thus, to be admissible, lay opinion testimony must meet two criteria: It must rationally be based on perception, and it must be helpful." *State* v. *Finan*, supra, 82 Conn. App. 228.

The court permitted Nadeau to testify as to his valuation, but stated that he would not be permitted to testify about the validity of his methodology. The court did not allow Nadeau to testify about his opinion as to the effect of the discontinued road on the property owners' ability to subdivide the property. This inquiry quite clearly concerned an area beyond the knowledge of the ordinary juror, and there was no abuse of discretion in disallowing the testimony. The court did not preclude the plaintiff from offering additional experts to testify to the validity of Nadeau's methodology. Because Nadeau was not an expert witness, we conclude that the court did not abuse its wide discretion in limiting his testimony to factual matters under § 7-1 of the Code of Evidence.

D

The plaintiff next claims that the court abused its discretion in admitting into evidence hearsay testimony by Sciame. On cross-examination, the plaintiff's counsel questioned Sciame regarding a property disclosure form shown to potential buyers in which he stated that the property was encumbered by an easement. The plaintiff's counsel asked: "And is that the easement that we've been discussing in this case?" To which question Sciame answered: "That is the easement we've been discussing in this case, and that is at the crux of the issue. You're required to disclose any easements. And actually, this, in talking to real estate brokers, could be why we have not gotten a single offer on the property. In that small universe of people that are interested, this jumps out—" The plaintiff's counsel objected on the grounds that the answer constituted hearsay and was unresponsive. The court overruled the objection.

"An out-of-court statement offered to prove the truth of the matter asserted is hearsay and is generally inadmissible . . . ." *State* v. *Hines*, 243 Conn. 796, 803, 709 A.2d 522 (1998); see also Conn. Code Evid. § 8-1.

Perhaps because Sciame's statement about the inability to sell occurred in the course of a narrative and was not subjected to rigorous analysis, its evidentiary foundation is unclear. To the extent that his testimony was a report of out-of-court statements by real estate brokers, offered for the truth of the statements, this

testimony was hearsay and should not, to that extent, have been admitted.

"[A]n evidentiary ruling will result in a new trial only if the ruling was both wrong and harmful. . . . [T]he standard in a civil case for determining whether an improper ruling was harmful is whether the . . . ruling [likely] would [have] affect[ed] the result. . . . A determination of harm requires us to evaluate the effect of the evidentiary impropriety in the context of the totality of the evidence adduced at trial. . . . Thus, our analysis includes a review of: (1) the relationship of the improper evidence to the central issues in the case, particularly as highlighted by the parties' summations; (2) whether the trial court took any measures, such as corrective instructions, that might mitigate the effect of the evidentiary impropriety; and (3) whether the improperly admitted evidence is merely cumulative of other validly admitted testimony. . . . The overriding question is whether the trial court's improper ruling affected the jury's perception of the remaining evidence." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Duncan* v. *Mill Management Co. of Greenwich, Inc.*, 308 Conn. 1, 20, 60 A.3d 222 (2013).

Sciame's testimony was not harmful. At first blush, the testimony appears to be harmful: the existence of the easement prevented a sale. Analytically, however, the testimony means a great deal less: putative buyers would not want to pay the asking price for the property because of the easement. There of course was a great deal of evidence on this point, such that a casual restatement by Sciame was of little importance. Accordingly, because the testimony was cumulative at best, it was not likely that the admission of the testimony affected the jury's perception of the remaining evidence. The "overriding question" posed in *Duncan* results in a conclusion of harmlessness.

### III

The plaintiff last claims that the court erred in denying its motion to set aside or to reduce the verdict. We disagree.

In its motion to set aside the verdict, the plaintiff argued, inter alia, that the verdict lacked evidentiary support. In denying the motion, the court concluded that there was evidence before the jury from which it could have found $2.2 million in damages in favor of the defendants.

"[T]he decision to set aside a verdict entails the exercise of a broad legal discretion . . . that, in the absence of clear abuse, we shall not disturb." (Internal quotation marks omitted.) *Rossman* v. *Morasco*, 115 Conn. App. 234, 241, 974 A.2d 1, cert. denied, 293 Conn. 923, 980 A.2d 912 (2009). "[A]lthough the trial court has a broad legal discretion in this area, it is not without its limits

. . . . Litigants have a constitutional right to have factual issues resolved by the jury. . . . This right embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . Similarly, [t]he credibility of witnesses and the weight to be accorded to their testimony lie within the province of the jury. . . . Furthermore, [t]he size of the verdict alone does not determine whether it is excessive. The only practical test to apply to [a] verdict is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption." (Citations omitted; internal quotation marks omitted.) *Johnson* v. *Chaves*, 78 Conn. App. 342, 346, 826 A.2d 1286, cert denied, 266 Conn. 911, 832 A.2d 70 (2003).

"Thus, [i]n ruling on the motion for remittitur, the trial court was obliged to view the evidence in the light most favorable to the plaintiff in determining whether the verdict returned was reasonably supported thereby. . . . A conclusion that the jury exercised merely poor judgment is an insufficient basis for ordering a remittitur. . . . The fact that the jury returns a verdict in excess of what the trial judge would have awarded does not alone establish that the verdict was excessive. . . . [T]he court should not act as the seventh juror with absolute veto power. Whether the court would have reached a different [result] is not in itself decisive. . . . The court's proper function is to determine whether the evidence, reviewed in a light most favorable to the prevailing party, reasonably supports the jury's verdict. . . . In determining whether the court abused its discretion, therefore, we must examine the evidential basis of the verdict itself. . . . [T]he court's action cannot be reviewed in a vacuum. The evidential underpinnings of the verdict itself must be examined." (Citations omitted; internal quotation marks omitted.) *Saleh* v. *Ribeiro Trucking, LLC*, 117 Conn. App. 821, 827–28, 982 A.2d 178 (2009), aff'd, 303 Conn. 276, 32 A.3d 318 (2011).

The plaintiff argues that the $2.2 million verdict was not supported by the evidence. It contends that only Franke proffered an opinion as to the diminution in value of the property as a result of the six foot easement, and he concluded that there was no diminution in value. There was no other relevant expert opinion before the jury, according to the plaintiff. We are not persuaded.

The jury was not bound to consider only Franke's opinion, but was entitled to weigh all the evidence. There was a great deal of evidence relevant to value before the jury. Franke, the plaintiff's expert, testified

that the diminution in value of the limited six foot easement was zero. He noted that the footpath had "very little impact" and that he "had a difficult time" finding the footpath and that it was "highly unlikely" that anyone would use the footpath. Nocera, an expert called by the defendants, testified that the diminution in value to the property as a result of the road was approximately $4.1 million and that, although the impact of the easement was not "reflected necessarily in [his] analysis," the easement "diminishes, substantially, the uniqueness, the exclusivity, the privacy of this property to the point where major damages occur."

Farricker, another expert called by the defendants, testified that the celebrity status of the Hepburn home imparted value in excess of the value reached by standard methods of appraisal. There was evidence that Sciame purchased the property for $6 million and, after performing renovations, had listed the property, at the time of trial, for $30 million. Sciame also testified that in 2009, after the discovery of the discontinued road, he believed that the house was worth $24 million as finished and that the diminution in value was between 20 to 30 percent of that value, which was $6 million. Although this calculation did not relate specifically to the easement, it was, nonetheless, relevant to the consideration of value. Sciame also testified as to the loss of privacy due to the easement. He indicated that he had seen people walk on the lawn, that from his bedroom he could see people walk across the easement and that they "get a good view of the house" from the end of the easement. He testified that the "loss of privacy and control has significantly affected the value of the property" because "people that are going to buy this type of house . . . generally they want exclusivity, and they want privacy."

There was evidence before the jury as to the value of the property, ranging from $6 million to $30 million, the degree to which the easement was used, and the loss of privacy because of the easement. Although the $6 million estimate assumed that the road encumbered the property, rather than the easement, that value nonetheless could have assisted the jury in determining the diminution in value caused by the easement, which was more limited. The size of the verdict, which was less than the amount sought by the defendant, does not so shock the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption. Construing the evidence in the light most favorable to sustaining the verdict, we do not conclude that the verdict had had no foundation in the evidence. Accordingly, the court did not abuse its discretion in denying the plaintiff's motion to set aside or to reduce the verdict.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] Paradise was owned by Frank Sciame, who also owned the defendant entities.

[2] *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

[3] *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

[4] As noted previously, the loss caused by the defect occurred in 2005, when the borough asserted its claim. The loss was mitigated in March, 2010, by the conversion of the discontinued road to a less cumbersome easement. The transfer of the easterly portion to Paradise occurred on May 23, 2011. The ultimate issue was the loss of value to the whole property caused by the encumbrance of the easement. Evidence regarding the eastern portion alone is relevant to the ultimate issue of market value of the entire property.